UNITED STATES PLYWOOD CORPORATION, A CORPORATION, PLAINTIFF-RESPONDENT, v. PHILIP L. NEIDLINGER, INDIVIDUALLY AND TRADING AS P. L. NEIDLINGER ASSOCIATES, DEFENDANT-APPELLANT.

Argued October 8, 1963—Decided November 4, 1963.

*Mr. Ralph S. Heuser* argued the cause for the appellant (*Messrs. Heuser, Heuser & DeMaio,* attorneys).

*Mr. Martin J. Cohen* argued the cause for the respondent (*Messrs. Green & Lasky,* attorneys).

68

PER CURIAM. The defendant Neidlinger had for many years conducted a business which involved his purchase of plywood materials and their installation in buildings under construction. In 1959, he discovered that his trusted bookkeeper had embezzled about $200,000 and, as a result, the business was insolvent. He consulted his attorney, the late Alfred J. Peer, who scheduled a meeting for May 18, 1959. The notice of the meeting was addressed to each of the defendant's creditors and stated that cooperation "with respect to the settlement of the various claims" was required "in order to effect some orderly payment." The meeting was held as scheduled and was attended by 25 or 30 persons, including Kermit Green, an attorney at law, who appeared for the plaintiff United States Plywood Corporation.

A memorandum, prepared after the meeting by Mr. Peer and distributed to the creditors, set forth his general summary of what had transpired. He noted that a creditors' committee had been appointed and that it consisted of Roy E. Scheider (representing Macy-Fowler, $2,087.85), Kermit Green (representing the United States Plywood Corporation, $23,000) and Frank Pascerella (representing Wood-Art, Inc., $6,000). The obligations of the defendant were reported as approximating $100,000 and his sole assets were reported as $4,000 in furniture, fixtures and equipment, $10,000 in accounts receivable, and some contracts on which no work had commenced. An attorney representing a corporation formed by William Fay, who had been associated with the defendant, offered to take over and complete these contracts and to remit the net profits (estimated at $25,000) to the creditors of the defendant. After referring to miscellaneous matters, the memorandum concluded with the comment that all of the creditors present expressed their willingness to go along with the plan suggested by the attorney for Mr. Fay's corporation. The memorandum was never intended to be an integration of everything that had transpired at the meeting and could not be viewed as precluding supplemental oral testimony. *Cf.*

*Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N. J.* 293, 303–304 (1953).

The creditors' committee took control of the defendant's reported assets and he heard nothing further from the plaintiff or any of the other creditors for about a year. In May 1960 his wife died leaving him a substantial inheritance and, in the following month, the plaintiff instituted an action in the Superior Court seeking recovery of the sum of $23,157.36, which represented its claim for merchandise delivered to the defendant. The defendant's answer set forth that the plaintiff, along with the other creditors, had entered into a settlement and composition agreement under which the plaintiff was to receive a proportionate amount of the assets transmitted by the defendant to the creditors. In the pretrial order, the defendant admitted the receipt of the merchandise and the reasonableness of its price and asserted that the oral understanding at the May 18th meeting was, in essence, a settlement and composition under which the plaintiff's claim was to be deemed fully satisfied by a proportionate amount of the assets turned over to the creditors' committee.

At the trial the plaintiff rested its case without introducing any oral testimony. It relied on the pretrial order and the opening statement by the defendant's counsel in which the receipt and reasonable price of the merchandise were acknowledged, though the affirmative defense of settlement and payment was reasserted. See *Federal Deposit Insurance Corp. v. Miller,* 130 *N. J. L.* 626, 628 (*E. & A.* 1943). In support of his defense the defendant presented testimony by Max Geller, along with his own testimony. Mr. Geller stated that he was a creditor of the defendant, that he had attended the May 18th meeting, that there was discussion as to the defendant's liabilities and assets, and that it was stated that something could be salvaged and "a percentage would be given to the creditors for the amounts due them." Counsel for the plaintiff did not cross-examine Mr. Geller.

The defendant testified that, at the meeting, a creditors' committee was appointed with authority to take control of his

inventory and accounts receivable and receive the net profits which would result from the Fay arrangement. When asked what was to happen to him, he said, "I was going bankrupt one way or another, and the term that I used at the time and I guess the only term I could use is a secondary form of bankruptcy." In response to a further question as to what was said at the meeting, he testified that his attorney told the creditors that the defendant would "either go bankrupt or an arrangement could be made which I had discussed with him prior to that in which the creditors could give a clearance to proceed under a bankrupt condition, and yet draw these profits of these contracts to the benefit of the creditors."

At the conclusion of the testimony on the defendant's behalf, the plaintiff still presented no oral testimony but moved for the withdrawal of the case from the jury and the entry of judgment. It urged (1) that nothing had been introduced to establish that Kermit Green was authorized to make a binding settlement on its behalf, and (2) that there was no evidence that the plaintiff and the other creditors had agreed to accept the assets turned over to the committee in full settlement of the claims against the defendant. The trial judge granted the motion on the latter ground and his action was sustained by the Appellate Division. We certified on the request of the defendant. *United States Plywood Corp. v. Neidlinger*, 40 *N. J.* 218 (1963).

When the plaintiff moved for the entry of judgment, the defendant was, under settled principles, entitled to have the facts considered most favorably from his point of view. If reasonable men could find from the testimony, and the inferences which might legitimately be drawn therefrom, that the parties attending the May 18th meeting contemplated that the defendant would be released upon the turnover of his assets to the committee, then it was the trial judge's duty to deny the motion, and call upon the plaintiff for any rebuttal testimony. See *J. L. Querner Truck Lines, Inc. v. Safeway Truck Lines, Inc.*, 35 *N. J.* 564, 566 (1961); *Melone v. Jersey Central Power & Light Co.*, 18 *N. J.* 163, 170 (1955).

The absence of an explicit release agreement in express terms would not preclude an implication in fact of such agreement. See *St. Paul Fire Marine Ins. Co. v. Indemnity Ins. Co. of No. America*, 32 *N. J.* 17, 23 (1960); 1 *Williston, Contracts* (*3d ed.* 1957), § 3, *p.* 11; 1 *Corbin, Contracts* § 18, *pp.* 39–41 (1963).

■ We consider that the lower courts erred in their view that no jury could reasonably infer from the evidence that the parties contemplated a release upon the defendant's turnover of his assets at the May 18th meeting. Mr. Geller, who was the only creditor called as a witness, testified that the discussion at the meeting bore upon the creditors' obtaining a percentage "for the amounts due them." While slight, the inference from this testimony points toward compromise and settlement rather than toward payment on account. The defendant's own testimony gave evidence of the contemplation that the turnover of the defendant's assets and the Fay arrangement for completion of his contracts, though in no sense a formal brankruptcy, would have the substantial incidences of bankruptcy. Thus he testified that his attorney had stated at the meeting that an arrangement could be made under which the creditors would give him "clearance to proceed under a brankrupt condition." And the defendant also testified that he viewed and referred to the arrangement as a sort of "secondary bankruptcy."

There was a time when bankruptcy was designed solely for the protection of creditors. Thus English bankruptcy law at the time of the American Revolution simply afforded a method for seizing the debtor's assets in order that they might be fairly distributed among his creditors. The first American bankruptcy act was molded along the same lines and it was not until the Act of 1841 that Congress provided that an honest debtor could voluntarily surrender his assets and effectively obtain a discharge from future liability with respect to past debts. See *Continental Ill. Nat. B. & T. Co. of Chicago v. Chicago, R. I. & P. R. Co.*, 294 *U. S.* 648, 668–670, 55 *S. Ct.* 595, 602–604, 79 *L. Ed.* 1110, 1124–1125

(1935); 1 *Collier, Bankruptcy* (14*th ed.* 1962), *pp.* 7–8. Later bankruptcy acts strengthened the discharge aspect of bankruptcy and in *Local Loan Co. v. Hunt,* 292 *U. S.* 234, 244, 54 *S. Ct.* 695, 699, 78 *L. Ed.* 1230, 1235 (1934), the court noted that, now, a primary aspect of bankruptcy is "to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' " The *Hunt* case stresses, as do many others, that this purpose is of high public as well as private concern, since it gives the honest but unfortunate debtor, who surrenders the property which he owns at the time of the bankruptcy, "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Ibid.;* see *Nadler, Bankruptcy* §§ 1–6 (1948); but *cf. In re Cummings,* 84 *F. Supp.* 65, 71 (*S. D. Cal.* 1949). In a more recent decision, Judge Goodrich expressed the common understanding that "straight bankruptcy proceedings" are designed "to liquidate the assets of the bankrupt, to pay off his creditors as quickly and inexpensively as possible and to free the bankrupt of the burden of accumulated debt so that he may begin his business life anew." *Susquehanna Chemical Corp. v. Producers Bank & Trust Co.,* 174 *F.* 2d 783, 786–787 (3 *Cir.* 1949).

In the light of the common understanding, a jury could reasonably infer that when the defendant, directly or through his attorney, spoke at the settlement meeting of May 18th, in terms of bankruptcy or clearance to proceed under a bankrupt condition, he contemplated discharge or release upon the turnover of his assets to the creditors' committee. Similarly it could reasonably infer from all of the evidence including Mr. Geller's testimony that such was also the contemplation of the creditors. A jury would have the undoubted right to draw inferences to the contrary; however, if it credited the testimony introduced on the defendant's behalf and drew the suggested inferences favorable to him, the manifested mutual assent necessary in law to support the asserted settlement

agreement would clearly be present. See *Leitner v. Braen,* 51 *N. J. Super.* 31, 38 (*App. Div.* 1958); *Gomez v. Federal Stevedoring Co., Inc.,* 5 *N. J. Super.* 100, 103 (*App. Div.* 1949); 1 *Williston, supra,* § 22A, *p.* 49. The binding nature of such a settlement agreement is not questioned here. See *Massey v. Del-Valley Corp.,* 46 *N. J. Super.* 400, 402 (*App. Div.* 1957):

"The law is settled that where two or more creditors agree to accept a stated percentage of their claims in full satisfaction of them, the agreement is binding, not only as among the creditors but as between each of them and the debtor. *Daniels v. Hatch,* 21 *N. J. L.* 391, 393, 394 (*Sup. Ct.* 1848); *Crossley v. Moore,* 40 *N. J. L.* 27, 34 (*Sup. Ct.* 1878); see *Levine v. Blumenthal,* 117 *N. J. L.* 23, 28 (*Sup. Ct.* 1936), affirmed at 117 *N. J. L.* 426 (*E. & A.* 1937); *Morris Canal* [*& Banking Co.*] *v. Van Vorst,* 21 *N. J. L.* 100, 119 (*Sup. Ct.* 1847); *cf. Ordinary v. Dean,* 44 *N. J. L.* 64, 69 (*Sup. Ct.* 1882); 1 *Williston, Contracts* (*rev. ed.* 1936), § 126; 6 *Corbin, Contracts,* § 1283 (1951)."

The plaintiff urges that, even if it be assumed that there was a settlement agreement on May 18th, the defendant may not prevail because there was no affirmative evidence that Mr. Green was authorized by it to make such settlement, citing *Trenton Street Ry. Co. v. Lawlor,* 74 *N. J. Eq.* 828, 831 (*E. & A.* 1908). The claim of lack of authority was not set forth in the pretrial order; it was belatedly asserted when the plaintiff moved for judgment. The trial court did not pass on the claim but, if it had, it would have been obliged to reject it for there clearly was enough evidence in the record to withstand the motion insofar as it was grounded on the issue of authority.

The plaintiff knew that the meeting of May 18th had been specifically called to consider the settlement of creditors' claims. It sent its attorney Mr. Green, who is also its attorney in the present litigation. Throughout the meeting Mr. Green acted on its behalf. He was appointed to the creditors' committee which took over the defendant's assets and he thereafter acted as a member of that committee. His connection with the committee was never questioned by the plaintiff. If

Mr. Green approved a settlement agreement, he presumptively had his client's authority to take that action. See *N. J. Highway Authority v. Renner,* 32 *N. J. Super.* 197, 200 (*App. Div.* 1954), aff'd 18 *N. J.* 485 (1955); *cf. Bernstein & Loubet, Inc. v. Minkin,* 118 *N. J. L.* 203, 205 (*E. & A.* 1937); *Kupper v. Barger,* 33 *N. J. Super.* 491, 494 (*App. Div.* 1955). See also *Gagnon Company v. Nevada Desert Inn,* 45 *Cal.* 2d 448, 289 *P.* 2d 466, 475 (1955); 66 *A. L. R.* 107, 126 (1930); 30 *A. L. R.* 2d 944, 953 (1953).

The plaintiff is, of course, at liberty to rebut the presumption by testimony from Mr. Green and others indicating that no authority had been granted. But even upon the introduction of such testimony there may be a factual issue for the jury (see *McCormick, Evidence* § 311, *pp.* 651–652 (1954)), not only as to whether there had been a grant of authority, but also as to whether the circumstances here gave rise to an apparent authority sufficient to protect the defendant. See *Ruppert v. Jernstedt & Co.,* 116 *N. J. L.* 214, 217 (*E. & A.* 1936), and *J. Wiss & Sons Co. v. H. G. Vogel Co.,* 86 *N. J. L.* 618, 621 (*E. & A.* 1914), where the court, in dealing with the doctrine of apparent authority, had this to say:

"The question in every such case is whether the principal has, by his voluntary act, placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question, and when the party relying upon such apparent authority presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury."

See also *Fuld v. Adams,* 108 *N. J. L.* 373, 377 (*E. & A.* 1931); *Cohen v. Goldman,* 85 *R. I.* 434, 132 *A.* 2d 414 (1957) and *Folsom v. Miller,* 102 *Ga. App.* 232, 116 *S. E.* 2d 1 (*Ct. App.* 1960) citing *Law v. Stokes,* 32 *N. J. L.* 249, 251 (*Sup. Ct.* 1867).

Reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.