**UNITED STATES of America, Plaintiff,**

**v.**

**Jerome LIGHTMAN, et al., Defendants.**

**No. CIV. 92–4710(JBS).**

United States District Court,
D. New Jersey.

Dec. 12, 1997.

Mark A. Gallagher, Trial Attorney, Environmental Enforcement Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington DC, Faith Hochberg, United States Attorney, Louis J. Bizzarri, Asst. U.S. Atty., United States Attorney's Office, Camden, NJ, for Plaintiff.

John M. Scagnelli, Eric S. Aronson, Whitman Breed Abbot & Morgan, Newark, NJ, for Defendant Stepan Company.

Robert A. Gladstone, Nan Bernardo, Shanley & Fisher, P.C., Morristown, NJ, for Joint Defense Group.

### OPINION

SIMANDLE, District Judge.

In this Superfund case, a group of defendants (The "Joint Defense Group" or "JDG") has moved to enforce an agreement between the JDG and defendant Stepan Company to fund the joint settlement of all defendants with the United States. The plaintiff, the United States, has joined this motion. In response to the motion, Magistrate Judge Rosen held an evidentiary hearing, and prepared comprehensive findings in a Report and Recommendation granting the JDG's motion to enforce the settlement with Stepan.

Defendant Stepan Company has objected to the Report's findings that there was an enforceable agreement between the JDG and Stepan Company and that Stepan is equitably estopped from denying the enforceability of the agreement. The JDG, while concurring with the Report's finding of an enforceable agreement, objects to the recommendation of denial of their request for attorney's fees and costs.

The issue in this motion essentially is whether a binding agreement-in-principle can be implied from the parties' course of conduct, namely Stepan's offer and the JDG's acceptance, despite provisions in an unexecuted memorialization of the agreement that specifically make the effectiveness of that document contingent upon written execution by all the parties. Because the resolution of this question requires a fact-intensive analysis, the court will set forth the factual background of the matter in some detail.

### I. BACKGROUND

This Superfund case has been pending before this court since November 1992. The United States, pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ["CERCLA"], 42 U.S.C. § 9607(a), has alleged that the defendants in this action are strictly liable, jointly and severally, for the

costs incurred by the United States in responding to the release and/or threatened release of hazardous substances deposited at the D'Imperio Property Superfund Site, Hamilton Township, New Jersey. Various defendants have also brought cross-claims against each other arising out of the D'Imperio Site and the Ewan Superfund Site located in Burlington County, New Jersey, asserting claims for contribution under section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

## A. *Settlement Negotiations*

At various stages in the litigation, aggressive settlement initiatives were undertaken by the parties, under the supervision of Magistrate Judge Rosen. In May of 1993, the court stayed the litigation so the defendants could engage in mediation in order to resolve a dispute between the defendants regarding the proper allocation of response costs amongst them. As a result of that first mediation effort, all alleged defendant and third-party defendant generators of waste, with the exception of Stepan Company, agreed to an allocation of responsibility for the cleanup costs of the two Superfund sites, and agreed to coordinate their defense jointly by forming a Joint Defense Group ("JDG").[1] Stepan Company, however, disputed the mediator's recommended allocation of costs, and chose not to join the JDG. As a result of this dispute, the litigation has proceeded with the JDG and Stepan each being represented by separate counsel.

Further settlement discussions then continued after the litigation resumed in October 1995. Pursuant to Magistrate Judge Rosen's supervision, the defendants all entered into negotiations with the United States in an effort to settle the United States' claims for past costs. (*See* Case Management Order No. 7, ¶ 3, Ex. A to Certification of Sean Monaghan (hereinafter "Monaghan Certif.").) On December 1, 1995, the United States proposed a settlement of the United States' claims for past costs whereby the government would agree to reduce its past costs claim from $8.7 million to $7.1 million. (*See* Ex. C to Monaghan Certif.) The government's proposal was contingent, *inter alia*, on the immediate payment of the $7.1 million, and the government therefore suggested that "the JDG and Stepan may, if they choose, agree amongst themselves to a temporary funding mechanism to make this payment, with a proviso that they readjust their contributions to the total at the conclusion of the contribution action." (*See id.*) Stepan and the JDG took steps to obtain a stay of the litigation so that the parties could negotiate and respond to the government's substantial reduction of its demand in order to achieve the benefits of an early settlement, according to the testimony of Mr. Matthews, who was Stepan's counsel at that time. (Matthews Dep. Tr. at 46:17 to 47:22.)

Accordingly, the defendants embarked on internal negotiations between the JDG and Stepan Company, pursuant to an Order of the court filed December 26, 1995, in the hopes of reaching an agreement on a way for the defendants to preserve their rights against each other while funding a settlement with the United States for its past costs claim. (*See* Case Management Order No. 9, ¶ 3, Ex. B. to Monaghan Certif.)[2] Negotiations progressed quickly, and on January 17, 1996, a letter was sent to JDG counsel Rob-

---

1. The JDG (also denominated the "Ewan/D'Imperio Joint Defense Group") consists of the following defendants: USG Corporation; Aluminum Shapes, Inc; Colonial Heights Packaging, Inc.; Continental Holding, Inc.; Croda Inks Corporation; DAP, Inc.; Scotts Paper Company; Sonoco Products Company; Union Carbide Corporation; Henkel Corporation; USG Corporation; and USX Corporation; and third-party defendants Air Products and Chemicals, Inc.; FMC Corporation; Kiwi Polish Company, a/k/a/ Kiwi Brands, Inc.; Quaker Chemical Co.; Stauffer Chemical Corporation; Synthane–Taylor Company; Whiting Patterson Company, Inc. and Wilmington Chemical Company. Collectively, Stepan Company and the members of the JDG constitute all "potentially responsible parties" (or "PRP's") which have been named in this CERCLA case.

2. Case Management Order No. 9, ¶ 3, entered after consultation with all counsel, provided in relevant part that "the Joint Defense Group and Stepan Company shall enter into settlement discussions with each other and with Plaintiff, United States of America, in an effort to resolve plaintiff's claims for past costs. The parties shall notify the court [Judge Rosen] on or before January 29, 1996 regarding the results of the negotiations."

ert Gladstone, Esquire, by Stepan's former counsel Robert Matthews, Esquire, of the firm of McKenna & Cuneo, setting forth Stepan's proposal for a set of principles for an agreement to fund the joint settlement of the United States' claims for past costs, under which each defendant's respective burden would be subject to future reallocation by trial, if necessary.[3] (*See* Ex. D to Monaghan Certif.) Stepan's General Counsel, Jeffrey W. Bartlett, had discussed the contents of Matthews' January 17, 1996 letter and approved it. (Matthews Dep. Tr. 24:12 to 26:19, at Ex. G to Stepan Company's Objections.) Throughout the subsequent negotiations, these fundamental terms never changed, and no attempt was made to change them. (*See* Monaghan Certif. ¶ 5.)

On January 22, 1996, during a telephone status conference with Magistrate Judge Rosen, the parties represented to the court that Stepan and the JDG were close to achieving settlement with the United States. (*See* Certification of Nan Bernardo, ¶ 3 (hereafter "Bernardo Certif."); *see also* letter of January 26, 1996 to Judge Rosen from Nan Bernardo, counsel to the JDG, Ex. A to Bernardo Certif.) Based on these assertions, Judge Rosen understood that the United States' claims for past costs were being resolved

through the joint funding agreement, and that the litigation would go forward without the United States so that the liability of defendants and third-party defendants upon the claims and cross-claims for contribution among themselves could be prepared for trial. Accordingly, he issued a Case Management Order in which it was contemplated that the United States would not participate in future depositions. (*See* Case Management Order No. 10, filed January 29, 1996, Ex. B. to Bernardo Certif. (providing that "[s]hould the defense group and Stepan fail to consummate settlement with the United States of America, it is understood that the United States will have an opportunity to redepose any individual produced for deposition pursuant to paragraph 3.").).

On February 15, 1996, Stepan's counsel, Robert Matthews, again sent a letter to JDG Counsel Robert Gladstone, transmitting a draft of a proposed funding agreement.[4] (*See* Ex. E to Monaghan Certif.) This proposal set forth in further detail a method for the parties to achieve the goals set forth in Mr. Matthews' previous letter, and specified an amount that Stepan would be willing to contribute toward the initial settlement payment to the government.[5] (*See* Monaghan

---

3. The letter first memorialized Mr. Matthews' understanding of the basic elements of a settlement by consent decree with the United States. This would include, *inter alia,* that the defendants would initially pay only a portion of the $7,100,000 settlement demand by the United States, with the shortfall to be paid upon final resolution of the contribution claims among the defendants. The amounts initially paid to the United States would be subject to reallocation based upon the final determination of liability for contribution claims among the defendants. Pending such final resolution, the parties would pay interest on the unpaid amount. ·

The letter next memorialized the basic principles of the funding agreement among the defendants. The following terms, among others, were discussed in this letter: That the agreement would specify the dollar amounts to be initially paid by each party, as well as the interest percentages to be paid by each party relative to the portion of the government's $7,100,000 settlement demand not paid at the time of settlement. All initial settlement payments and interest payments made pursuant to this agreement would be subject to reallocation upon final resolution of the contribution claims. The portion of the United States' $7,100,000 claim not paid initially at

the time of settlement would be paid pursuant to the final resolution of the contribution claims. The terms of the agreement were to remain confidential.

4. All of the drafts exchanged by the defendants were entitled "Settlement Agreement"; the court will, however, refer to this agreement as the "Funding Agreement," for the sake of clarity.

5. Stepan's proposed Funding Agreement set forth in specific terms the following: the initial amount to be paid to the U.S.; the proportion of this initial payment to be paid by each defendant including Stepan itself; the interest rate to be paid on the deferred balance of the settlement amount; the proportion each party, including Stepan, would pay of the periodic interest payments. (*See* Monaghan Certif. ¶ 6). Finally, the Stepan Proposal suggested that the deferred settlement balance would be paid on the earlier of: (i) two years after the entry of the Partial Consent Decree or (ii) final resolution of the defendants' claims in the cost contribution action, and suggested a proportion each defendant would pay in the absence of final allocation. (*See* Monaghan Certif. at ¶ 6.)

Certif. at ¶ 6.) [6] In his letter, Mr. Matthews at first did not hold the attached proposal out as a firm offer, explaining that he had 'not had an opportunity to review the draft with his client because his client contact was out of the country; he therefore reserved the right to make changes to the draft "based on such discussion". (*See* Ex. E to Monaghan Certif. ¶ 3.) Because Mr. Matthews did not subsequently make any changes to the essential terms of the draft, either upon his client's return or at any time thereafter, (*see* Monaghan Certif. ¶ 7), the Matthews letter of February 15, 1996, including the attached draft funding agreement, constituted a firm offer from Stepan for a funding agreement. Mr. Matthews indeed has testified that Mr. Bartlett (Stepan's General Counsel) reviewed the February 15, 1996 offer letter upon Bartlett's return, and that when Matthews discussed the settlement offer with Bartlett, Bartlett indicated no disagreement with "the direction in which we were heading on negotiating this settlement". (Matthews Dep. Tr., *supra*, at 43:14 to 44:19.)

On February 20, 1996, Mark Gallagher of the United States Department of Justice sent to counsel for Stepan and the JDG a proposed Partial Consent Decree for settlement of the United States' claims for past costs. (*See* Ex. F to Monaghan Certif.) This Partial Consent Decree incorporates the principles described in Mr. Matthews' letters.[7]

On February 29, 1996, members of the JDG met by telephone conference, in which a voting majority of the JDG indicated their approval of the terms of Stepan's funding proposal and the partial consent decree, but suggested some modifications to the language of both documents. (*See* Monaghan Certif. at ¶ 10.) Counsel for the JDG then forwarded a revised draft of the Funding Agreement to Mr. Matthews on March 9, 1996. This revised draft incorporated the suggested modifications to the language of Stepan's proposal without making any changes to the fundamental terms of the agreement. (*See id.* at ¶ 11.) Counsel for the JDG and Stepan then conferred repeatedly by telephone between March 18 and April 17, and negotiated further refinements to the language of the funding agreement; no changes to the fundamental principles of the settlement were made. (*See id.* at ¶¶ 13–18.) These discussions between Stepan (represented by Mr. Matthews and Joyce Lim, Esquire, also of the firm of McKenna & Cuneo) and the JDG (represented by Mr. Gladstone and Mr. Monaghan of Shanley & Fisher) amounted to fine tuning of language, not renegotiation of substantive terms of payment, timing or the like; indeed, these negotiated revisions were described by Ms. Lim as merely "conforming changes." (Facsimile of Mar. 19, 1996 by Joyce Lim to Sean Monaghan, Ex. I to Monaghan Cert.)

On April 9, 1996, at a case management conference before Judge Rosen, it was again represented to the court that the parties were finalizing their settlement. (*See* Bernardo Certif. ¶ 5.) Accordingly, the subsequent revised Case Management Order filed by the court on April 26, 1996, CMO No. 11, again contemplated that discovery would proceed without the participation of the United States. (*See* Ex. C to Bernardo Certif.)

Negotiations between defendants and the United States continued to progress, with

---

6. It should be noted that although the parties contemplated that the specific terms of the funding agreement would be confidential (*see supra* n. 3), Stepan submitted as exhibits unredacted copies of the draft funding agreements. This court has paid no attention to the numbers contained in those documents, however, and has relied, wherever possible, upon the certifications and redacted documents submitted by the JDG. Neither party has suggested that the numbers contained in those documents are in any way relevant to the analysis of this motion to enforce the settlement.

7. The United States' partial consent decree proposed in relevant part that

Settling Defendants shall pay to the EPA Hazardous Substance Superfund $7,100,000 in reimbursement of Past Response Costs, plus an additional sum for interest on that amount calculated from January 22, 1996 through the date of payment. Of this amount, $6,106,000 plus interest would be paid within 30 days of the Effective Date. The remaining balance of $994,000 plus interest would be paid on or before the earlier of: (a) the date two years after the Effective Date; or (b) the date that litigation of this matter is concluded in the U.S. District Court for the District of New Jersey whether through settlement, judgment or otherwise.

counsel for the JDG and Stepan conferring frequently by telephone to generate suggestions which were made to the United States for refinements to the language of the Partial Consent Decree. (*See* Monaghan Certif. at ¶¶ 19–21.) According to Mr. Matthews' testimony, all parties represented to Judge Rosen around April 9, 1996, that all were in agreement, that the parties were on track, and that "there were no issues that had been identified that were going to knock us off track." (Matthews Dep. Tr. 53:11 to 54:3, *supra.*)

Discussions regarding the language of the Funding Agreement concluded in a meeting on May 6, 1996, in which counsel for Stepan and the JDG conferred by telephone and either reached or came close to reaching final agreement regarding the details of the language for the funding agreement.[8] It was understood by all parties involved that the Stepan Settlement Agreement would be executed immediately after the execution of the Partial Consent Decree with the United States. (*See* Monaghan Certif. at ¶ 23.) The signature pages for the Stepan Settlement Agreement were not circulated among the parties, however, pending receipt of the United States' signature pages for the Partial Consent Decree. (*See id.* at ¶ 22.)

Over the next month, discussions continued among all parties regarding the Partial Consent Decree with the United States. (*See id.* ¶ at 24.) An essentially final version of the Partial Consent Decree was produced by Counsel for the United States on May 20, 1996.[9] At no time during the discussions leading up to this point did counsel for Stepan indicate in any way that Stepan did not consider itself bound by its agreement with the JDG to finance the settlement with the United States for past costs. (*See id.*) On June 24, 1996, the Partial Consent Decree

was circulated among the parties, along with a request that the parties sign the signature page and return it to Sean Monaghan, counsel for the JDG. (*See id.* at ¶¶ 26, 29.) Throughout the following months, while members of the JDG were submitting executed signature pages to the Partial Consent Decree to Mr. Monaghan, Stepan gave no indication of an intent to withdraw from either the Funding Agreement or the Partial Consent Decree.

A new issue, having no direct bearing on the Stepan–JDG funding agreement, was introduced into the negotiation of the Partial Consent Decree when the United States District Court for the Southern District of Alabama held the retroactive application of CERCLA § 107(a) and 106(a) to be unconstitutional. (*See id.* at 26.) (discussing *United States v. Olin,* 927 F.Supp. 1502 (S.D.Ala. 1996).) Both the JDG and Stepan became interested in having an opportunity to test the legality of the *Olin* decision before this court. (*See id.*) Members of the JDG and Stepan therefore discussed several options, including abandoning negotiations of the Partial Consent Decree in order to immediately move to dismiss the complaint. (*See* Ex. H ¶ 1 to Stepan's Objections to Magistrate Joel Rosen's January 27, 1997 Report and Recommendation (hereinafter "Stepan Objections").) On June 7, 1996, the JDG and Stepan approached the United States and proposed either that the lodging of the Partial Consent Decree be delayed or that the Decree include a provision regarding the effect of any future development in Superfund law that might arise from the *Olin* decision. (*See id.* at ¶ 3.) Counsel for the United States Mark Gallagher rejected this proposal, explaining that the Justice Department and the EPA considered the *Olin* decision to be an aberration, and warning that any action taken in reliance upon the *Olin* decision would

---

8. Counsel for the JDG claim that a final draft was agreed upon at that meeting. (*See* Monaghan Certif. ¶ 22.) Counsel for Stepan, however, does not recall a time when all defendants approved a final draft. (*See* Matthews Dep. at 62, Ex. G to Stepan objections.) Mr. Matthews recollects, however, that all issues internal to the funding agreement between Stepan and the JDG had been resolved by that time, notwithstanding that there may have remained "some I's [to dot]

and some T's [to cross]." (*Id.* at 62:10–16 & 63:1–3.)

9. Issues relating to the correct names of the settling defendants and their predecessors and successors subsequently necessitated some additional changes to the language of the Partial Consent Decree, but no further substantive changes were made after June 20, 1997. (*See* Monaghan Certif. at ¶ 27.)

jeopardize the settlement negotiations with the United States. (*See id.*) Mr. Gallagher also warned defendants of his prediction that any attempt to litigate the retroactivity issue would likely be met with hostility by this court. (*See id.*) Mr. Gallagher nonetheless agreed to a two week delay in finalizing the Consent Decree, in order to permit the defendants to decide whether to take any action based upon the *Olin* decision. (*See id.* at ¶ 4.)

On June 10, 1996, Stepan Company replaced Mr. Matthews of McKenna & Cuneo with John M. Scagnelli, Esquire, and Eric S. Aronson Esquire, of Whitman, Breed, Abbott & Morgan. The next day, Robert Matthews and the firm of McKenna & Cuneo filed a notice of withdrawal of its representation of Stepan and indicated that Stepan would now be represented by Whitman, Breed, Abbott & Morgan. Around July 23, 1996, Eric Aronson, new counsel for Stepan, orally advised a member of the JDG that Stepan was considering backing out of the settlement with the United States. (*See* JDG's Reply to Stepan's Objections at 5.) On September 12, 1996, new counsel for Stepan Company abruptly advised the United States, the JDG and the court that Stepan would no longer participate in the settlement by consent decree with the United States. (*See id.* at ¶ 30.)

By letter dated September 13, 1996, the United States withdrew, as to Stepan only, the offer upon which the proposed settlement was based. (*See* Certification of Eric Aronson ¶ 3 (hereafter "Aronson Certif.").) The United States subsequently reconsidered its position, however, and reiterated its willingness to settle with Stepan and the JDG under the settlement terms already agreed upon, subject to approval of the Assistant Attorney General and the Court. (*See* United States' Response to JDG's Motion to Enforce Settlement, at 5.)

B. *JDG's Motion to Enforce the Stepan Agreement*

The JDG then brought a motion in November 1996 to enforce what it alleges was a binding agreement between Stepan and the JDG to jointly negotiate and fund the Partial Consent Decree, and the United States joined this motion. The JDG argued that an enforceable agreement was reached when Mr. Matthews, in a letter dated January 17, 1996, set forth the fundamental terms of the proposed funding agreement between Stepan and the JDG. Specifically, the JDG suggested that an agreement was reached concerning what portions of the Government's past costs demand should be paid initially by both Stepan and the JDG, and how the short-fall was to be funded. The JDG pointed to the fact that throughout the subsequent negotiations between the parties, the principal terms of the agreement never changed. Further, the JDG pointed to the fact that the provisions were formalized in an agreement between Stepan and the JDG, which was to be signed after execution of the Partial Consent Decree, as evidence that there was a meeting of the minds between the JDG and Stepan, as well as between the government and Stepan. The JDG also sought costs for the filing of this motion. Additionally, the JDG urged that, even assuming *arguendo* that there is no enforceable settlement agreement, Stepan should be required to pay fees and costs that will be incurred by the JDG as a result of the government's re-entry into the litigation and the possibility that the government may have to redepose and otherwise seek discovery.

In response to the motion, Stepan argued that regardless of whether the major components of a settlement had been agreed to, there is not and never has been an enforceable agreement between Stepan and the JDG to jointly negotiate and fund a settlement with the United States. Stepan argued that throughout the negotiation process it was understood by all defendants that the proposed funding agreement would not be binding and enforceable unless all parties individually signed it. In support of this argument, Stepan pointed to specific language in the draft funding agreement, which specifically requires the signature of all parties in order for the document to take effect.[10] Stepan

---

10. Paragraph 2 of the draft funding agreement provides: "This Agreement shall only be effective

if all parties, including each member of the JDG and Stepan Company individually sign this

also pointed to language in the proposed agreement which provides that the agreement between the defendants would not take effect until the consent decree with the United States is entered and lodged.[11] Stepan further argued that former counsel for Stepan, Robert Matthews, Esquire, never had authority to finalize the agreement. Finally, Stepan argued that Mr. Matthews, by his own testimony, had indicated that there were still issues outstanding with regard to the funding agreement between the parties, such that no party to the negotiations could have believed that the proposed agreement had been adopted and become binding.

This motion to enforce the settlement was referred to Magistrate Judge Rosen on a report and recommendation basis. Judge Rosen supervised discovery related to this motion, and depositions of Mr. Gladstone and Mr. Matthews were convened on December 4, 1996, which transcripts have been reviewed.[12] Judge Rosen conducted a hearing on December 6, 1996, hearing arguments on behalf of the JDG, Stepan Company and the United States, and receiving the evidence developed by the parties.

Magistrate Judge Rosen prepared an excellent Report and Recommendation for this Court, which was filed January 27, 1997. In his thorough and well reasoned Report,

Judge Rosen found the following. First, he found that Mr. Matthews, counsel for Stepan Company during the settlement negotiations, had the authority—either implied actual authority or apparent authority—to enter into a binding settlement agreement. (*See* Report at 10.) Next, Judge Rosen found that Stepan did enter a binding agreement with the JDG because (a) Stepan's course of conduct throughout the litigation clearly manifested an intent to be bound, and (b) substantial acts were performed under the agreement by both sides, and (c) the JDG, the Government, and the court acted in reliance upon Stepan's indications that an agreement was in place. (*See id.* at 15.) Finally, Judge Rosen found that even assuming *arguendo* that the agreement was not enforceable, Stepan is equitably estopped from attacking the settlement, because Stepan engaged in voluntary conduct that was detrimentally relied upon by the government, the JDG, and the court. (*See id.* at 18.) With regard to the JDG's application for fees and costs, Judge Rosen recommended, without explanation, that the application be denied. (*See id.* at 21.)

## II. DISCUSSION

Stepan company objects to a number of Judge Rosen's findings of fact[13] and conclu-

Agreement." In addition, Paragraph 19 provides, in pertinent part: "If all parties do not sign this Agreement, this Agreement shall be deemed ineffective pursuant to paragraph 2 above. The *ineffective agreement shall not be* admissible in any proceeding for any purpose whatsoever." (*See* Ex. B to Aronson Certif.)

11. The relevant portion of the proposed draft agreement states: "WHEREAS, upon entry of the consent decree, this Agreement will become effective;".

12. The record contains no testimony or affidavit from Stepan Company's Vice President and General Counsel, Jeffrey Bartlett, or any other Stepan officer or employee. When the JDG sought Bartlett's deposition, Stepan Company sought and obtained a protective order. (Stepan's Motion appears at Ex. R. to JDG's Reply to Stepan's Objections.)

13. Stepan objects to the following findings of fact: (1) that representations were made to the court that a settlement agreement had been reached; (2) that the final settlement was reached no later than May, 1996; (3) that Stepan's withdrawal from the proposed settlement

with the United States was inconsistent with the previous representations of Stepan's counsel; (4) that Stepan delegated full authority to Mr. Matthews to enter into a binding settlement agreement; (5) that Stepan's in-house counsel never indicated to Mr. Matthews any dissatisfaction with any of the provisions in the agreement; (6) that Mr. Matthews had implied authority to act on behalf of Stepan; (7) that Mr. Matthews had apparent authority to act on behalf of Stepan; (8) that Stepan's course of conduct clearly manifested an intent to be bound; (9) that the government manifested an intent to be bound when it refrained from participating in discovery; (10) that it is contradictory for Stepan to rely on the terms of the draft funding agreement as proof of the ineffectiveness of that document, where the draft also proscribes the admissibility of the draft agreement in any proceeding for any purpose if the agreement is not signed by the parties; (11) that public policy favors the settlement of this dispute; (12) that the parties manifested a clear intent to be bound.

sions of law.[14]

The JDG, while agreeing with all other findings in the Report and Recommendation, objects to the recommendation that attorney's fees and costs not be assessed against Stepan Company. Although Stepan Company seeks *de novo* review of Magistrate Judge Rosen's findings, no party has suggested that this court reconvene a hearing for receiving new evidence, nor has any party argued that the factual record is incomplete. To the contrary, as discussed below, the record developed before Judge Rosen contains all necessary facts for determining whether the JDG's motion to enforce settlement should be granted.

### A. *Standard of Review*

■ Pursuant to 28 U.S.C. § 636(b)(1), Rule 72(b) of the Federal Rules of Civil Procedure and Local Civil Rule 72.1(a)(2) of the New Jersey Federal Practice Rules ("Local Rules") (formerly General Rule 40A.2), a United States Magistrate Judge may hear "dispositive" motions assigned by the district court. As to dispositive motions which are addressed in a Magistrate Judge's report and recommendation, the statute provides that the district court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." 28 U.S.C. § 636(b)(1). Moreover, when conducting a *de novo* determination, the district judge is not required to rehear contested testimony. *See United States v. Raddatz,* 447 U.S. 667, 674, 100 S.Ct. 2406, 2411–12, 65 L.Ed.2d 424 (1980).

■ The standard of review of a magistrate's judge's determination depends upon whether the motion is dispositive or nondispositive. With regard to nondispositive motions, the "district court may modify the magistrate's order only if the district court finds that the magistrate's ruling was clearly erroneous or contrary to law." *Cipollone v.*

*Liggett Group, Inc.,* 785 F.2d 1108, 1113 (3d Cir.1986). With respect to dispositive motions, the district court must make a *de novo* determination of those portions of the magistrate's Report to which a litigant has filed an objection. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(a); Local Civil Rule 72.1(c)(2). The district court, consistent with congressional intent in Section 636(b)(1), may place reliance upon a magistrate judge's proposed findings and recommendations consistent with "the exercise of sound judicial discretion." *Raddatz,* 447 U.S. at 676, 100 S.Ct. at 2413. The *de novo* standard of review is applicable here because the enforcement of a funding agreement between the defendants is determinative of the parties' rights as expressed in their agreement. Since virtually all relevant findings in Magistrate Judge Rosen's Report have been objected to, this court will not address each objection individually, but rather will conduct a *de novo* analysis of all relevant legal and factual issues.

### B. *Applicable Law*

Neither party has objected to the choice of law in Judge Rosen's Report. Accordingly, the question of whether Stepan company entered into an enforceable agreement with the JDG is governed by federal common law, which shall be determined primarily by reliance upon New Jersey contract law. In addition, all issues related to agency law (including the scope of Mr. Matthews' authority to bind his client) will be determined under New Jersey law. *See Fisher Development Co. v. Boise Cascade Corp.,* 37 F.3d 104, 108–09 (3d Cir.1994) (where CERCLA is silent, enforcement of contract can be through incorporating state law or through developing federal common law after considering whether a nationally uniform body of law is required, whether application of state law would frustrate specific objectives of the federal programs, and whether application of a federal rule would disrupt commercial relationships predicated on state law).

---

14. Stepan makes the following objections to the conclusions of law in the Report: (1) that this court does not have the power to create a settlement agreement between Stepan and the JDG; (2) that there can be no equitable estoppel because there was no reliance and detriment; (3) that the report improperly shifts the burden of proof to Stepan; (4) that Matthews did not have authority to bind Stepan.

### C. *Enforcement of a Settlement Under Contract Law*

■■ A contract is formed where there is offer and acceptance and terms sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty. *See Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992). That contract is enforceable if the parties agree on essential terms, and manifest an intention to be bound by those terms. *See id.* Where the parties do not agree on one or more essential terms, however, courts generally hold that the agreement is unenforceable. · *See id.*

The JDG, as the party seeking to enforce the alleged settlement agreement, has the burden of proving the existence of the agreement under contract law. *See Amatuzzo v. Kozmiuk,* 305 N.J.Super. 469, 475, 703 A.2d 9 (App.Div. 1997); *see also Nolan v. Lee Ho,* 120 N.J. 465, 472, 577 A.2d 143 (1990). For the reasons now discussed, this court finds that the JDG has met its burden and proved that Stepan and the JDG reached an agreement-in-principle for all material terms of the JDG/Stepan funding agreement (by which all potentially responsible parties agreed to fund their respective shares in amounts necessary to satisfy the United States' settlement demand for past costs, preserving all defendants' rights to allocate final liability for these sums by trial if necessary). The court further finds that Stepan Company has come forward with no compelling circumstance justifying its later withdrawal from the agreement with the JDG. Accordingly, the agreement must be enforced. *See Nolan,* 120 N.J. at 472, 577 A.2d 143 (stating that "in general, settlements will be honored "absent a demonstration of 'fraud or other compelling circumstances' " ").

#### 1. *The Elements of a Binding Contract are Present*

■ The first element of an enforceable contract, an offer, is present in this case. Stepan Company made an offer to the JDG, memorialized in the letters and attachments thereto of Stepan counsel Robert Matthews dated January 17 and February 15, 1996. (*See supra* at 451–53.) This offer contained very specific terms regarding issues such as the amounts Stepan would contribute in an initial payment to the United States, the amounts to be contributed by the other defendants (each of which is a member of the JDG), the proportion of interest to be paid by each defendant on the deferred balance, the method to be used for reallocating the payment burden among the defendants upon final disposition of the contribution claims between the defendants, and the deadline for final payment of the deferred balance. (*See supra* at 452, n. 3.) Furthermore, although this proposal was not initially held out as a firm offer by Stepan, it became a firm offer when Matthews consulted with his client, Bartlett, during the week following the February 15th letter, and Bartlett assented to going forward with Matthews' proposal on behalf of Stepan, as discussed above. Matthews continued to regard this position as Stepan's funding agreement with the JDG, and he unmistakably conducted further discussion with the JDG using this Stepan offer as the touchstone of the agreement.

The record also supports the finding that there was effective acceptance by JDG of Stepan's offer. The JDG manifested a clear intent to accept Stepan's offer when, on March 9, 1996, counsel for the JDG sent to Mr. Matthews a revised draft of Stepan's proposal, which incorporated refinements to the language of the proposal ·without making any changes to the fundamental terms of the settlement, as discussed above. That the JDG had accepted Stepan's offer was further evidenced by the conduct of counsel for the JDG over the subsequent two months, as counsel for the JDG continued to negotiate with Stepan regarding refinements to the language of the funding agreement, without ever taking issue with the fundamental terms described in Stepan's proposals. (*See supra* at 453–54.) Internal correspondence between members of the JDG reflects the understanding of the JDG that it had accepted Stepan's offer and that an agreement-in-principle was therefore in place. For example, in an internal memorandum dated April 3, 1996 from Arthur Vogel, Treasurer of the JDG, to the members of the JDG, Mr. Vogel stated:

> We are still making progress, as I understand it, toward settling the Govern-

ment's past cost claim at the D'Imperio Site for $7.1 Million. I thought it would be helpful to demonstrate how this money *will be* raised among the members of the Joint Defense Group.

Under the proposed settlement, the Government expects an initial payment of $6,106,000.... Of the $6,106,000 to be raised immediately, *Stepan has agreed to a payment of* $_____. That leaves a total of $_____ to be raised among members of the Joint Defense Group.

(*See* Ex. K to Monaghan Certif. (emphasis added) (figures redacted).)

Stepan maintains, however, that these discussions described above did not produce a binding agreement. For support, Stepan points to the clauses in the unexecuted draft Funding Agreement, which state that the agreement is not enforceable until (a) it is signed by all parties and (b) a consent decree with the United States is executed by the parties and entered by the court. (*See supra* at n. 7, n. 8.) Stepan makes two arguments regarding the effect of these clauses in the draft Funding Agreement. First, Stepan argues that the fact that the draft Funding Agreement and the Partial Consent Decree were never executed is evidence that no binding contract was created. Second, Stepan argues that the inclusion of this language in the draft Funding Agreement reflects an intent of the parties to not be bound in any way until both the draft Funding Agreement and the Consent Decree have been signed by all parties.

Stepan's first argument—that under the terms of the draft Funding Agreement the agreement cannot be binding because it has not been executed—reflects a misunderstanding regarding the exact agreement which JDG seeks to enforce. The JDG does not seek to enforce the written but unexecuted draft Funding Agreement. As Stepan correctly notes, that agreement, by its own terms, specifically requires that both it and

the Consent Decree be signed by all parties before it may be enforced, and those conditions of enforceability have not been met. What may be enforceable, however, is the agreement-in-principle which was reached by the parties on or around March 9 when the JDG accepted the terms of Stepan's proposed funding agreement.

■ The terms of this agreement, which can be lifted directly from Mr. Matthews' proposal of February 15, are sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.[15] Moreover, it is well established in New Jersey that an agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing. *See Pascarella v. Bruck,* 190 N.J.Super. 118, 124, 462 A.2d 186 (App.Div.1983) (quoting *Green v. John H. Lewis & Co.,* 436 F.2d 389, 390 (3d Cir. 1970)); *Harrington v. Harrington,* 281 N.J.Super. 39, 46, 656 A.2d 456 (App.Div. 1995) (citing *Lahue v. Pio Costa,* 263 N.J.Super. 575, 596, 623 A.2d 775 (App.Div.1993)). New Jersey law specifies that parties may orally, by informal memorandum, or both, agree upon all essential terms of a contract and effectively bind themselves thereon, if that is their intention, even though they contemplate the later execution of a formal document to memorialize their undertaking. *See Comerata v. Chaumont, Inc.,* 52 N.J.Super. 299, 305, 145 A.2d 471 (App.Div.1958) (citing Williston on Contracts, rev. ed.1936, § 28, 28A, pp. 59 *et seq.*). Accordingly, although the terms of the draft Funding Agreement may inform this court's understanding regarding the intent of the parties, the fact that the written document was never executed is irrelevant to the enforceability of the agreement, since that is the agreement-in-principle, rather than the draft Funding Agreement, which the JDG seeks to enforce.[16]

---

**15.** Furthermore, any uncertainty that may arise regarding the exact requirements of the agreement may be resolved by reference to the draft of the agreement produced on May 6, 1996. Although we are not enforcing any written document, that document, which was drafted cooperatively by counsel for the JDG and Stepan, is the

most recent and most refined memorialization of the specific terms of the funding agreement agreed upon by the defendants.

**16.** In his Report, Judge Rosen suggested that "it is contradictory for Stepan to rely upon, as evidence of the ineffectiveness of the agreement, the

According to the JDG, the obligations created by the agreement-in-principle fall into two categories—those arising prior to execution of the Consent Decree, and those arising upon execution and entry of the Consent Decree. The JDG argues that prior to execution of the Consent Decree, the agreement-in-principle binds all defendants to negotiate in good faith with the United States until a mutually acceptable settlement by consent decree is agreed upon; and once such agreement is reached, to not withdraw from that agreement with the United States without first obtaining permission of the other defendants. (*See* Ex. E to Stepan's Objections, deposition of Robert Gladstone at 18.) Then, upon execution and entry of the Consent Decree, the agreement-in-principle requires all defendants to execute the Funding Agreement and thereafter abide by the payment terms set forth in that Agreement. The thrust of the JDG's argument, therefore, is that the obligation of the defendants to negotiate and enter a settlement with the United States, although perhaps never discussed explicitly as a term of the agreement-in-principle, was an assumption upon which the agreement-in-principle was premised, and was understood by the parties to be an implicit term of the agreement. As explained below, the court agrees with the JDG's interpretation of the Agreement, and finds that the only reasonable interpretation of the conduct of the parties is that they agreed upon all material terms of the funding agreement and believed themselves to be bound to jointly negotiate and participate in a settlement with the United States.

Because this court is asked to enforce an unwritten and unexecuted agreement, the court must base its decision upon whether the parties manifested an intent to be bound. *See Comerata*, 52 N.J.Super. at 305, 145 A.2d 471. The undertaking of performance by one party, concurred in by the other party, is strong evidence of an intention to be bound to an oral agreement, notwithstanding that a later execution of a formal contract is contemplated. *See id.* Where the issue of the intent of the parties is sharply contradicted, the credible evidence—such as the documents and the conduct of the parties—and permissible inferences therefrom are sufficient to justify the factual finding of the trial judge. *See Berg Agency v. Sleepworld–Willingboro, Inc.,* 136 N.J.Super. 369, 374, 346 A.2d 419 (App.Div.1975) (affirming a trial judge's finding of an intent to be bound on the basis of the nature of the documents and the extrinsic evidence regarding the conduct of the parties).

In the instant case, Stepan Company and all members of the JDG manifested a clear intent to be bound among themselves to fund the settlement proposed by the United States. That the agreement-in-principle incorporates such an obligation is the obvious implication of the January and February 1996 proposals by Stepan. Where a party represents, both orally and in writing, that it will contribute a certain amount toward a joint settlement, provided the settlement is consistent with certain proposed principles, then the unavoidable implication is that that party intends to participate in such a settlement. Furthermore, the defendants all undertook substantial performance of their duties under the contract when Stepan and the JDG jointly negotiated with the United States regarding the terms of the Consent Decree—negotiations which resulted in a final draft of the Decree being distributed to all defendants, with signature pages being executed by many of the defendants. It is unlikely that the members of the JDG—or Stepan, for that matter—would have invested such extensive resources into negotiations with the United States if they did not believe that their co-defendants agreed with one an-

---

very terms of the agreement, namely ¶¶ 2 and 19, thus essentially giving them effect, while ignoring the latter portion of ¶ 19 that proscribes the admissibility of the agreement in any proceeding for any purpose whatsoever if the parties do not sign the agreement." (Report at 16.) The Report also states that "Stepan's act of providing the document to the court and contending that "its terms are critical" belie its own assertions that the agreement is unenforceable." (*id.*) This language in the Report suggests that Magistrate Rosen may have believed that it was the draft Funding Agreement, rather than the agreement-in-principle, that he was being called upon to enforce. To the extent that this is the case, the court disagrees with Judge Rosen, and reiterates that it is the agreement-in-principle that this court will enforce.

other to fund and to participate in a settlement agreement with the United States.

Furthermore, if any defendant had reason to doubt the good faith intention of their co-defendants in this regard, they would have required their co-defendants to enter a written and executed agreement in order to secure their participation in the settlement process. That all the defendants invested their energies in negotiating with the United States without first securing such assurances from their co-defendants is strong evidence that the defendants all presumed each other to already be bound to meet the United States' settlement demand and to participate in and fund that settlement, through the allocation of funding responsibility set forth in the agreement-in-principle.

Communications by Stepan to the JDG gave the JDG every reason to be confident that Stepan fully intended to participate in funding the settlement with the United States, (while preserving all rights among the participating defendants to allocate final liability upon cross-claims by trial if necessary). For example, the January 17 letter from Robert Matthews uses interchangeably the words "shall", "will" and "would," without the use of any conditional qualifiers, in describing the proposed terms of the consent decree and the draft funding agreement, thereby reflecting his assumption that these agreements would be achieved. Likewise, Stepan's February 15 letter to Gladstone proposed the respective funding shares of each participant necessary to meet the United States' overall demand and stated a spe-cific figure that Stepan would contribute toward the settlement.

Further evidence that Stepan manifested an intent to be bound to negotiate and fund the settlement is found in the fact that Stepan permitted the JDG, the United States, and this court to rely upon the impression that an agreement was at hand. Judge Rosen's Report finds that the government acted in reliance upon the repeated affirmations made to the court beginning in January 22, 1996 that Stepan and the JDG were close to achieving a settlement with the United States, when it refrained from participating in further discovery, and that the court acted in reliance upon these affirmations by ordering discovery to proceed without the participation of the United States.[17] (*See* Report at 15.) If Stepan had not at that time formed an intent to abide by the agreement-in-principle, it would not have stood silently by while counsel for the JDG made repeated affirmations to the court regarding the strong prospects for a settlement with the United States that would include Stepan. Stepan's silence in the face of these affirmations, which continued for months until September 1996, in the face of the action-in-reliance undertaken by the JDG, the United States, and the court, is therefore strong evidence of an intent to be bound by the agreement-in-principle.[18]

Stepan next argues that the language of the draft Funding Agreement—which makes the effectiveness of the Funding Agreement contingent upon the execution of the draft Funding Agreement and the Consent Decree—is evidence of the parties' intent not to

---

17. This court wishes to clarify that the actions taken by the United States and the Court in reliance on these affirmations are not, on their own, directly probative of the intent of Stepan. What is relevant evidence of the intent of Stepan, however, is the fact that Stepan knew that affirmations were being made to the court and relied upon by the parties, yet took no action to correct the impression that Stepan was expected to participate in the settlement with the United States.

18. Stepan objects to Judge Rosen's finding that affirmations to the court were made that a settlement with the United States had been reached. (See Stepan Objections at 4.) It is not alleged, however, and Judge Rosen did not find that Stepan ever told the Court that a final settlement with the United States had been reached; the settlement with the United States is not at issue in this motion. Rather, it is the agreement-in-principle to fund the arrangement among all potentially responsible parties that is at issue here. The record is replete with support for the finding that affirmations to the court were made that the parties were close to achieving a settlement with the United States, and the obvious implication of this affirmation is that all defendants have agreed among themselves to cooperate in the negotiation and funding of the settlement with the United States. These affirmations among the PRP's and to Judge Rosen himself would have made no sense if the Stepan/JDG agreement-in-principle was not already in place.

be bound until those conditions are met. The court disagrees with this interpretation of the language of the draft Funding Agreement, and finds that the clauses of the draft Funding Agreement discussed above do not indicate an intent of the parties to not be bound in any way until the very moment when both the Funding Agreement and the Consent Decree are signed by every party. Rather, the logical interpretation of these clauses is that as a logistical matter, the agreement will not be binding until all parties have signed both agreements, but that the parties all have a good faith intent to sign the agreement, barring an unforeseeable and unavoidable change in circumstances.[19] Without such a provision, no party would ever want to be the first to sign an agreement, for fear that they will be bound even if others back out of the agreement at the last minute. Indeed, this is the interpretation suggested by Stepan's former counsel Robert Matthews, who participated in drafting the draft Funding Agreement. (*See* Ex. G. to Stepan Objections, Matthews dep. at 38, 41–42 (stating "I think this is fairly standard, the [n]otion being that you want to send in [to the United States] the signature pages of all the parties at one time rather than separately for fear that somebody at the last minute will have second thoughts.")) Furthermore, there is cause for serious doubt regarding whether these clauses were even the subject of negotiation between the parties; Mr. Matthews testified that he did not remember any negotiation regarding these provisions, and speculated that they were boilerplate provisions included by an attorney from his office. (*See* Ex. G to Stepan Objections, Matthews dep. at 38–42.)

The court therefore finds that the inclusion of these clauses into the draft Funding Agreement is not relevant to whether the parties all manifested a good faith intention to be bound by the agreement-in-principle, and further finds that the enforceability of the agreement is not contingent upon the execution of the Consent Decree. We therefore interpret the terms of the agreement-in-principle to require the parties to enter the Consent Decree, barring an unforeseeable change in circumstances, such as an unresolvable difference between the parties regarding an issue not addressed in Stepan's proposal, or the failure of another party to execute the agreement.[20] Accordingly, the court must determine whether such an unforeseeable event was the cause of Stepan's last-minute withdrawal from the settlement.

Stepan points to the discussions that took place among the defendants regarding the *Olin* decision as evidence that the defendants had not yet manifested a firm intent to be bound to the Funding Agreement or the Consent Decree. (*See* Stepan Objections at 8–10.) Stepan's briefs, however, stop short of arguing that the *Olin* issue was the actual reason for Stepan's withdrawal from the settlement process. Furthermore, the record does not support such a finding. Stepan never suggested to the JDG that its willingness to continue negotiating the consent decree was in any way conditioned upon a revisitation of the *Olin* issue. Presumably, had the *Olin* issue been a serious source of concern to Stepan, Stepan would have want-

---

**19.** Furthermore, the fact that the parties had drafted final or close to final versions of both the funding agreement and the consent decree should not, as Stepan suggests, weigh against enforcement of the contract. Stepan cites *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355 (Fed.Cir.1992) for the proposition that where a settlement agreement has not been signed, the court will presume that the parties do not intend for it to be binding, and will therefore not enforce it. (*See* Stepan Brief in Opposition to Motion to Enforce, at 15.) *Wang* is, however, easily distinguished from the instant case on two grounds. Firstly, in *Wang* the negotiations had not yet ended, and the failure to finalize and execute the agreement was the result of mere delay, rather than actual withdrawal from the settlement by one of the parties.

Secondly, unlike *Wang*, in the instant case the court is not asked to enforce the written agreement, but rather to enforce a prior agreement-in-principle.

**20.** The JDG suggests that under the terms of the agreement, the parties were in fact not permitted to withdraw from the settlement with the United States, absent consent of the other defendants. (*See* Ex. E to Stepan Objections, Dep. of Robert Gladstone at 18.) It is not necessary for the court to determine whether this interpretation is correct, however, since the court finds that Stepan failed to meet their obligations even under the more permissive interpretation of the Agreement, stated above.

ed to give the United States and the JDG an opportunity to negotiate some sort of a compromise resolution that would address Stepan's concerns, or Stepan would have indicated its desire to file an *Olin* motion. Instead, Stepan made no request for such a compromise, and gave no explanation for its abrupt withdrawal from the negotiations. No party, including Stepan, ever suggested that it wished to file an *Olin* motion in this case, so far as the record reveals. Furthermore, the testimony of Stepan counsel Robert Matthews does not support a finding that the *Olin* issue was the cause of Stepan's withdrawal.[21]

Stepan asserts that by his repeated reference to Stepan's failure to explain its withdrawal, Judge Rosen has shifted the burden to Stepan to explain its withdrawal, when the burden of proof should be upon the party asserting the enforceability of the agreement, in this case the JDG. The court does not read Judge Rosen's report to be shifting the burden as Stepan suggests. When Stepan agreed to the terms of the agreement-in-principle, Stepan undertook to cooperate with the JDG to negotiate in good faith with the United States. (*See supra* at 459–61.) Accordingly, when Stepan abruptly withdrew from negotiations with the United States without explanation, Stepan breached its agreement-in-principle with the JDG. Stepan's failure to explain its reason for withdrawal strongly suggests that the reason was not some unforeseen and irreconcilable difference between the parties regarding the terms of the consent decree or the funding agreement—such as, for example, the *Olin* issue—but was rather a change in Stepan's litigation strategy. When Stepan offered the terms of the proposed funding agreement on January 22 and February 15, 1996, and permitted the JDG to accept and act upon those terms, Stepan foreclosed itself from pursuing any litigation strategy, with regard to the United States' past costs claims, apart from the strategy of good faith negotiation of a

Partial Consent Decree with the United States funded by the arrangement among the PRP's that Stepan had offered and the JDG had accepted.

 Where a party to an agreement-in-principle suddenly changes its mind and refuses to execute the written contract without explanation, the court must enforce the agreement. *See Pascarella v. Bruck*, 190 N.J.Super. 118, 462 A.2d 186 (App.Div.1983). In *Pascarella*, the court enforced the agreement where the parties had orally reached an agreement-in-principle and the plaintiff subsequently changed her mind and decided that she did not like the terms of the agreement after all. *See id.* at 120–21, 462 A.2d 186. Like the plaintiff in *Pascarella*, Stepan changed its mind about the desirability of funding the settlement with the United States after Stepan had already agreed to a set of principles under which it would participate in the joint funding. Under the law in New Jersey, the agreement-in-principle must, in these circumstances, be enforced.

Lest there be any confusion, we wish to restate, once more, the exact parameters of this holding. We do not hold that the settlement between all defendants and the United States for past costs be enforced. Nonetheless, it is our expectation that the settlement with the United States will ensue as a result of this decision. Furthermore, we do not hold that the unexecuted draft of the funding agreement, produced by negotiation among the defendants on May 6, 1996, be enforced. Rather, it is the agreement-in-principle, reached by the JDG and Stepan on or around March 9, 1996, which we enforce. Nonetheless, it is our expectation that the May 6 draft will likely be relied upon to resolve any questions regarding the performance required of each party under the agreement-in-principle, because it is the most recent, most detailed, and—because it was negotiated cooperatively by all defendants—the most reliable memorialization of the parties' intended obligations under the agreement-in-principle.

---

**21.** When asked what his client thought of the *Olin* issue, Mr. Matthews testified that

My best recollection of Mr. Bartlett's position was that he was not particularly confident about the appropriateness of the *Olin* decision

and that the decision regarding the Consent Decree or the whole concept of the Consent Decree would not rise or fall on *Olin*.

(Matthews Dep. at 72, *supra*.)

It is worth noting at this time that the enforcement of this agreement-in-principle is hardly a heavy burden upon Stepan. As the agreement clearly provides, Stepan is free to litigate the amount of proper allocated share without any reference to the amount that Stepan and other PRP's agreed to contribute to the Funding Agreement.

### 2. *Stepan's Counsel Had Authority to Bind Stepan to the Contract*

Under New Jersey law, it has been held that "[n]egotiations of an attorney are not binding on the client unless the client has expressly authorized the settlement or the client's voluntary act has placed the attorney in a situation wherein a person of ordinary prudence would be justified in presuming that the attorney had authority to enter into a settlement, not just negotiations, on behalf of the client." *See Amatuzzo v. Kozmiuk*, 305 N.J.Super. 469, 475, 703 A.2d 9 (App.Div. 1997) (citing *United States Plywood Corp. v. Neidlinger*, 41 N.J. 66, 74, 194 A.2d 730 (1963) (citing and quoting *J. Wiss & Sons Co. v. H. G. Vogel Co.*, 86 N.J.L. 618, 621, 92 A. 360 (1914))). In that case, which was submitted to this court in supplemental briefing by Stepan, the counsel for the parties had notified the court that they had agreed to enter a stipulation of settlement; the defendant subsequently refused to sign the stipulation, however, claiming that he had not authorized his attorney to enter such a settlement. *See id.* 305 N.J.Super. at 471–72, 473, 703 A.2d 9. The defendant in *Amatuzzo* submitted a certification in which he stated under oath that he had told his attorney that he strenuously objected to the terms of the settlement. *See id.* at 473, 703 A.2d 9. The appellate court found that this certification was sufficient to raise a material and substantial issue regarding the attorney's authority, and therefore remanded the matter for an evidentiary hearing on that question. *See id.* at 476, 703 A.2d 9. In contrast to that case, although Stepan objects to Judge Rosen's finding that Stepan's counsel had actual authority to enter the agreement-in-principle, Stepan has submitted no sworn statements or other evidence that Stepan's General Counsel, Mr. Bartlett, objected to the terms of the funding agreement proposed by Stepan's litigation attorney, Mr. Matthews. The testimony of

Robert Matthews reflects his understanding that his client approved the terms of his proposal of January 17, 1996, as well as the proposed funding shares contained in his letter of February 15, 1996, and that Stepan thereafter extended to Mr. Matthews authority to negotiate a settlement in accord with those terms. (*See* Ex. G to Stepan Objections, Matthews dep. at 26–29, 66–67.) His client reviewed Matthews' February 15, 1996 letter to JDG and again affirmed that Matthews was on the right settlement track. No employee of Stepan has asserted, either through testimony or affidavit, that Mr. Matthews acted beyond his authority with regard to the negotiation of the Funding Agreement and Consent Decree. Indeed, Stepan's new lawyers secured a protective order preventing the JDG from deposing Jeffrey Bartlett, Esquire, Stepan's General Counsel, who was Mr. Matthew's client-contact at Stepan. Had Mr. Bartlett believed that Mr. Matthews' offer of terms of the funding agreement was inconsistent with the authority conferred upon him, Mr. Bartlett would presumably have welcomed the opportunity to say so on the record, as the client in *Amatuzzo* did (see above). Moreover, unlike *Amatuzzo*, the agreement in this case was based upon the authorized offer transmitted to the JDG by counsel for the objecting party itself. Unlike *Amatuzzo*, this case boils down to the question of whether a party that authorizes its counsel to offer an agreement-in-principle, which is thereafter accepted and acted upon by all co-defendants, can subsequently change its mind and withdraw from the agreement-in-principle months later and without explanation. It is apparent that neither *Amatuzzo* or any other New Jersey case law would justify such an abrogation of the agreement that the parties had entered.

Stepan not only objects to Judge Rosen's finding that Robert Matthews, counsel to Stepan, had actual authority to bind his client to the agreement-in-principle, but also objects to the finding that Matthews had apparent authority to do so. In determining whether an agent has apparent authority, the key inquiry is whether "the principal, by his voluntary actions, placed the agent in such a situation that a person of ordinary prudence,

conversant with general business practice, is justified in believing that the agent had authority to perform the act in question." *United States Plywood Corp. v. Neidlinger,* 41 N.J. 66, 74, 194 A.2d 730 (1963) (quoting *J. Wiss & Sons Co. v. H. G. Vogel Co.,* 86 N.J.L. 618, 621, 92 A. 360 (1914).) This court agrees with Judge Rosen's finding that Stepan's attorneys had apparent authority to bind Stepan to the agreement-in-principle, because Stepan knowingly placed their attorneys in such a situation that the members of the JDG, the United States, and this court were justified in believing that Stepan's attorneys had authority to bind Stepan to the proposed Funding Agreement. No evidence contradicts Mr. Gladstone's testimony and Mr. Monaghan's certification that Stepan had engendered their belief that Mr. Matthews possessed Stepan's authority to conclude the agreement-in-principle, since Mr. Matthews was authorized to convey to the JDG the offer that was accepted by the JDG. Throughout the negotiations, counsel for Stepan always copied their correspondence to Jeffrey Bartlett, Esq., Stepan's Vice President and General Counsel. Discussions subsequent to correspondence always proceeded in a manner consistent with Mr. Matthews and his co-counsel Ms. Lim having obtained all necessary approvals from Stepan. (*See* Monaghan Certif. at ¶ 24.) During the negotiations regarding the language of the funding agreement, Mr. Matthews and Ms. Lim never gave any indication that Mr. Bartlett and/or Stepan had any reservations regarding the fundamental terms of the agreement. Indeed, Mr. Matthews' testimony discloses that Stepan had no such reservations, as Stepan's general counsel was fully informed of all developments and gave his assent to the Stepan position articulated by Mr. Matthews throughout the early months of 1996 when the agreement-in-principle was finalized. Furthermore, even when Mr. Matthews explicitly reserved the right to check with his client regarding the acceptability of the terms, as, for example, he did in his proposal of February 15, 1996, he spoke with his client, who never subsequently made changes to the terms of his proposal, which all the parties regarded as a firm offer, as discussed above. (*See supra* at 453.) Under

these circumstances, the only reasonable conclusion the JDG could have reached was that Mr. Matthews had the authority to bind Stepan to the funding agreement based upon Stepan's manifested assent to Matthews' conduct. Accordingly, this court finds that Stepan's counsel Robert Matthews acted with both actual and implied authority when he made an offer of proposed funding principles that was accepted by the JDG.

### 3. *Public Policy Also Favors the Enforcement of this Agreement*

■ Finally, the enforcement of the funding agreement is consistent with the public policy of New Jersey in favor of settlements. *See Bistricer v. Bistricer,* 231 N.J.Super. 143, 151, 555 A.2d 45 (Ch.Div.1987) (stating that "the policy of our court system is to encourage settlement and the court should 'strain' to uphold such settlements."); *Honeywell v. Bubb,* 130 N.J.Super. 130, 325 A.2d 832 (App. Div.1974). New Jersey's policy in favor of enforcing settlements is especially important in complex multiple-party litigations such as this one, where the costs of a breach by one party are often great, and where there may be incentives for parties to negotiate in bad faith if they believe that the agreement-in-principle will not be enforced. Gamesmanship, rather than good faith conduct toward adversaries, would be encouraged. One party, by threatening to withdraw from an agreement-in-principle without justification, could amass undue bargaining power against others who relied on the success of the agreement-in-principle. Indeed, given Stepan's failure to suggest any reason for its sudden withdrawal, it seems possible that Stepan had just such a scenario in mind when it withdrew, suddenly and without explanation, from the negotiations with the United States. This kind of manipulative behavior cannot, as a policy matter, be tolerated. To permit it would be to reduce incentives for parties in a complex litigation to engage in settlement negotiation.

■ The public interest in enforcing a funding agreement-in-principle among potentially responsible parties is especially clear in multi-party hazardous waste litigation under

CERCLA. Congress has affirmatively favored the settlement of the United States' claims in CERCLA cases and has vested broad discretion in the federal courts to supervise and approve such settlements. *See* 42 U.S.C. § 9622(g). It has become commonplace for potentially responsible parties to seek a joint agreement among themselves for together negotiating and funding an appropriate Consent Decree with the government on a collective basis. Such collective action can minimize the otherwise staggering costs of Superfund litigation while providing to the United States the prospect of finality that drives a relatively prompt and reasonable compromise. The public interest in remediation of Superfund sites is also served by court-supervised settlement discussions and agreements such as those that occurred in this case. *See Manual for Complex Litigation, Third,* § 33.72 at 379–381 (FJC, 1995 ed.) (endorsing court-supervised CERCLA settlement processes). In order to serve this function, a court must be able to rely upon the representations of parties who confirm that an agreement-in-principle has been reached that leads the way to the collective negotiation of the Consent Decree with the United States.

■ In New Jersey, even leaving aside the public interest in settling Superfund claims, parties that agree to act collectively for the mutual benefit of each other owe a duty of good faith and fair dealing. *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 420–21, 690 A.2d 575 (1997). It would be unfair in the extreme for a party—here Stepan—to propose a joint funding agreement, obtain the acceptance of all other parties, induce joint reliance of all parties in dealings with the court and with the plaintiff United States, and then, after seven months, renounce its own agreement, merely because it changed its mind regarding whether this agreement was in its own best interest. In this situation, absent some compelling change of circumstance not presented here, no one party can appropriate unto itself the right to pull the rug out from under all other parties which relied upon the mutual agreement-in-principle.

### D. *Fees and Costs or Other Sanctions*

■ The JDG requests the imposition of sanctions, including costs and counsel fees for the prosecution of its Motion to enforce the settlement and for any motion-related discovery, and objects to Judge Rosen's finding that the application should be denied. Judge Rosen recommended that the application be denied. (*See* Report at 21.) The JDG acknowledges that no rule or statute provides for such fee shifting, but argues that such an award should be made to protect the integrity of the court and to prevent abuses of the judicial process under the inherent power of the court to sanction litigant or attorney misconduct. (JDG Br. at 27–30, and JDG objections at 2 (citing, *inter alia, Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) and *Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65 (3d Cir.1994)).) The JDG argued that sanctions are appropriate to remedy the alleged bad faith misconduct of Stepan Company toward all parties and toward the court, necessitating this motion practice to enforce the settlement.

It is well settled that the inherent power of the court to sanction misconduct by the attorneys or parties before the court should be invoked only in extraordinary circumstances to remedy abuse of the judicial process. As this court recently stated in *Loatman v. Summit Bank,* 174 F.R.D. 592, 599–600 (D.N.J.1997):

> In *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45, 111 S.Ct. 2123, 2132–33, 115 L.Ed.2d 27 (1991), the Supreme Court held that federal courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." This power includes the ability to assess attorney fees where appropriate. *Id.* at 45, 111 S.Ct. at 2133. The Court cautioned, however, that this power should be exercised with restraint and only in narrowly defined circumstances. *Id.* at 44–45, 111 S.Ct. at 2132–33. The Court noted that the " 'American rule' prohibits fee shifting in most cases." *Id.* at 45, 111 S.Ct. at 2133. An award of fees may be proper, however, when:

a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.... In this regard, if a court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. *Id.* at 45–46, 111 S.Ct. at 2133, (citations and quotation marks omitted.) The decision of whether to impose sanctions under a court's inherent authority is reviewed for an abuse of discretion. *Id.* at 55, 111 S.Ct. at 2138.

The Third Circuit has admonished district courts to exercise with due care their inherent power to sanction. For example, in *Republic of Philippines v. Westinghouse Elec., Corp.*, 43 F.3d 65, 74 (3d Cir.1994), the Third Circuit stated that "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent power, and must also ensure that the sanction is tailored to address the harm identified." The court noted that sanctioning district court should be careful to sanction the appropriate, culpable individual, whether he or she is a litigant or an attorney in the case. *Id.*

In the present case, Judge Rosen, who supervised the settlement process and the motion practice, determined that the inherent authority should not be invoked. Judge Rosen's views of attorney and party conduct, as the judicial officer supervising the pretrial and settlement processes in this case, are entitled to substantial weight. Judge Rosen indeed made findings that Stepan acted inequitably in making affirmative representations relied upon by the other defendants, the United States and the court. (Report at 19.) He found that Stepan engaged in "bad faith in their litigation strategy" by "affirmatively lulling their adversaries and this court into this situation." (Report at 20, and n. 11 (citing *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474–75 (D.C.Cir.1995); *Republic of the Philippines v. Westinghouse Electric, supra.*)) Judge Rosen found this strategy was "an irrespon-

sible and cynical manipulation of the judicial process which has prejudiced other parties to this lawsuit, and if permitted, will undermine the integrity of the judicial process." (*Id.* at 20.) These findings were made in the context of Judge Rosen's discussion of whether equitable estoppel applies in the event, *arguendo*, that no enforceable agreement was created. (Report at 17–20.)

Although I agree that the elements of equitable estoppel would be satisfied by the circumstances of the positions taken by Stepan, the JDG, the United States and Judge Rosen, it is unnecessary to decide this motion on those grounds, because I have determined that the parties achieved an agreement through offer, acceptance and intent to be bound, manifested through their conduct, as discussed above.

Although perhaps not articulated in this manner, Judge Rosen found that the proper remedy for Stepan's conduct was to enforce the agreement through equitable estoppel, as discussed in his Report at 17–20, *supra*, and not through the shifting of costs and attorneys fees under the inherent power of the court. I too will decline to exercise the inherent power to shift costs and fees. I have not found that Stepan Company, when it negotiated and entered into the agreement in principle, engaged in a cynical or misleading strategy, nor that it abused the court's process at that time. Stepan conducted itself at that time as a responsible litigant with the JDG. It was only months later, when new counsel entered the case for Stepan and announced Stepan's repudiation of its own funding agreement, that the breach giving rise to this motion occurred. The remedy for this breach of contract is to enforce the contract and to require Stepan and the JDG to perform. As in any contract case, fees to enforce are not normally awarded where the contract, as here, is silent on the subject. Under the "American rule," fee shifting to the successful litigant is not permitted in most cases absent extraordinary misconduct not present here. Therefore, Judge Rosen correctly determined that the JDG's petition

for costs and attorneys fees should be denied.[22]

## III. CONCLUSION

For the reasons explained above, this court finds that Stepan Company entered into an enforceable agreement with the JDG to negotiate and fund a settlement with the United States of the United States' past cost claims. It is therefore not necessary to address whether Stepan is equitably estopped from attacking the settlement. The court further finds that no fees, costs or other sanctions should be imposed against Stepan. Accordingly, the JDG's motion to enforce the agreement-in-principle, in which the defendants agreed to negotiate and fund a settlement by consent decree with the United States, will be granted, but the JDG's motion for attorney's fees and costs will be denied.

### *ORDER*

This matter having come before this court upon the motion of the Joint Defense Group ("JDG") to enforce an alleged settlement agreement; and the court having considered the Report and Recommendation submitted by the Honorable Joel B. Rosen, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C); and the court having considered the submissions of the parties; and

Having reviewed *de novo* the findings contained in the Report and Recommendation and having found that the Recommendation should be adopted for reasons stated in the Opinion of today's date;

IT IS, this 12th day of December, 1997 hereby ORDERED and ADJUDGED that the JDG's Motion to enforce the defendants' agreement-in-principle is hereby GRANTED, and the agreement—which obliges Stepan and all members of the JDG to fund the settlement of the United States' claims for response costs in accordance with the

agreed-upon principles—shall be enforced; and it is

FURTHER ORDERED that the JDG's Motion for costs and fees is hereby DENIED.

---

22. In light of the court's determination to enforce the agreement, we do not reach the JDG's argument that Stepan Company should be made to bear the costs of repeating all discovery that had been undertaken in the United States' absence—amounting to depositions of some 35 witnesses, *see* Report at 18. A consequence of enforcing the Stepan/JDG funding agreement will be to satisfy the United States' demand for funding the government's demand for response costs, ending the United States' involvement in establishing liability of these PRP's in this case. Thus, there is no need to repeat these depositions for the benefit of the government, and this item of costs is of no further moment.