136 N.J. Super. 369 (1975)
346 A.2d 419
THE BERG AGENCY, A NEW JERSEY CORPORATION, AND ARTHUR BRESSMAN, t/a LINDWEISS ASSOCIATES, INC., PLAINTIFFS-RESPONDENTS,
v.
SLEEPWORLD-WILLINGBORO, INC., A NEW JERSEY CORPORATION, SLEEPWORLD EAST BRUNSWICK, INC., A NEW JERSEY CORPORATION, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1975.
Decided October 2, 1975.
*371 Before Judges LYNCH, ACKERMAN and LARNER.
Mr. William E. Ozzard argued for appellants (Messrs. Ozzard, Rizzolo, Klein, Mauro & Savo, attorneys).
Mr. Richard Galex argued the cause for respondent Arthur Bressman (Messrs. Heilbrunn, Tabman, Josephs, Finkelstein, Heilbrunn and Garruto, attorneys).
Mr. David M. Baer argued the cause for respondent The Berg Agency (Messrs. Baer and Arbeiter, attorneys).
The opinion of the court was delivered by LARNER, J.A.D.
Arthur Bressman, trading as Lindweiss Associates, was the owner of a vacant commercial building in Woodbridge, New Jersey, known as the Whitney Building. In an effort to rent the same he communicated with various real estate brokers, including the plaintiff Berg Agency.
Mr. Faria of the Berg Agency was contacted by Seymour Lustig, a principal in several companies operating retail furniture outlets, for the purpose of locating a site for his business, and on or about May 9 Faria brought him to the Whitney Building. Lustig evinced an interest in leasing the same, although he balked at the owner's demand of an annual *372 rental of $60,000. He did, however, suggest to Faria that he would consider a deal at a rental of $48,000 a year.
As a consequence Faria arranged a meeting between Bressman and Lustig at Lustig's office which took place on May 10. At that meeting the parties negotiated various terms of the lease, orally agreeing to most of them. Faria took notes on the various items discussed, but the meeting ended on a negative note when Bressman refused to accept as a tenant a corporation to be formed solely for this operation. He insisted that he would not enter into a lease with a shell corporation and would only consider the deal if other active corporations owned by Lustig would execute the lease.
After this conference Faria had prepared at his office a memorandum dated May 10, 1972, which incorporated the areas of agreement and returned with this document to Lustig. The latter was anxious to tie up the property at his suggested rental figure of $48,000. At the urging of Faria, Lustig signed the May 10 letter changing the corporate name of the proposed lessee to Sleepworld-Willingboro, Inc. and also submitted a check in the sum of $1,000 with a legend thereon, "Binder for Route #9, Fords, Woodbridge Township, N.J."
The next day Faria returned to Lustig and advised him that Bressman insisted on the undertaking by several of the Sleepworld corporations operated by him before he would entertain the proposition. Lustig stated that if that was the only way to get the building he would have to accede to Bressman's request. As a consequence Lustig, through his secretary, modified the May 10 letter, including three of his corporations as parties and adding other provisions for expansion of the facilities in the future, and making further revisions in some of the other terms in accord with Bressman's wishes as communicated by Faria. He read this document dated May 11, 1972 and signed it in the presence of Faria, who then added his signature as a witness.
*373 Armed with this document executed by Lustig, Faria arranged to meet with Bressman that very night. Bressman reviewed this revised document and also signed it in the presence of Faria.
The following morning Lustig called Faria, advising him that he had changed his mind and that he did not consider himself bound since from his viewpoint the letter was but a preliminary proposal. This was followed by a stop payment order on the check and a letter from Lustig's attorney stating his position.
The Berg Agency sued defendant corporations for the commissions of which it was deprived because of the alleged failure by them to perform the contract of May 11, 1972. Bressman sued for his out-of-pocket losses incurred because of said breach. Defendants asserted that the May 11 letter was not a binding contract and that their actions in withdrawing from the transaction were therefore not wrongful so as to impose liability to either plaintiff.
The case was heard by the trial judge without a jury. In evaluating the written exhibits and the oral testimony of the parties involved, and assessing the same from a standpoint of credibility and the sophistication and experience of the individuals involved, the judge concluded that the parties intended to be bound by the May 11 document despite the fact that they contemplated a more formal lease. The rescission by defendants, through Lustig, without good cause, was held to be a breach of that contract, and damages were assessed in favor of both plaintiffs in accord with the evidence in the record.
The thrust of defendants' appellate position is that the May 11 document did not contain all the essential terms of a lease so as to constitute a binding contract and that the trial judge erroneously concluded that the parties intended to be bound by that document.
It is well settled that parties may effectively bind themselves by an informal memorandum where they agree *374 upon the essential terms of the contract and intend to be bound by the memorandum, even though they contemplate the execution of a more formal document. Comerata v. Chaumont, Inc., 52 N.J. Super. 299 (App. Div. 1958); Zuendt v. A. Eisenstein, Inc., 139 N.J. Eq. 476 (Ch. 1947); 1 Williston, Contracts § 28 (3d ed 1957). "The ultimate question is one of intent." Comerata, supra 52 N.J. Super. at 305.
The trial judge found such an intent from the nature of the document of May 11 and the extrinsic evidence of the dealings among the parties.
The document itself is couched in terms of a finite, bilateral undertaking, without conditions or contingencies, except for the contents of paragraph 8. This latter paragraph reflects the contemplation of execution of a formal lease, with a proviso that the tenant shall not enter into possession until the formal lease is executed. As noted, the mere fact that the parties proposed to execute a more formal document does not negate the effectiveness of the memorandum as a contract. By the same token, the fact that the landlord would not permit possession until that formal lease was signed does not necessarily contradict an intent to be bound by the memorandum.
In any event, the question of intent was a sharply disputed issue at a trial laced with contradictory evidence in that regard. The credible evidence and permissible inferences therefrom are sufficient to justify the factual finding of the trial judge  a finding beyond the pale of appellate interference. State v. Johnson, 42 N.J. 146 (1964).
In fact, the testimony of Lustig relating to the legend on the May 10 check is fairly conclusive of his intent throughout the entire transaction. On cross-examination he testified:
Q And you realized when you wrote the word binder that you wanted to hold Mr. Bressman, isn't that so? Isn't that so?
A Yes.

*375 Q You didn't want him to go out and lease that building to someone else when you signed that check, did you?
A Not when I signed the check, no.
Appellant relies heavily on the case of Trustees First Pres. Church v. Howard Co. Jewelers, 22 N.J. Super. 494 (App. Div. 1952), aff'd 12 N.J. 410 (1953), as a precedent for denying relief to plaintiffs herein. We find that case to be distinguishable on its facts. In Trustees the memorandum was introduced by language which belied an intent to be bound thereby, such as, "we are prepared to enter into a lease * * * provided we can do so on the following basis * * *." 22 N.J. Super. at 496. The proposal was submitted to the landlord which thereupon adopted a resolution accepting the proposal and directing its attorney to prepare a lease. The lease differed in many respects from the proposal by the potential tenant. And the Appellate Division opinion takes pains to recite these differences. Hence it was logical for the court to conclude that there was no meeting of the minds when the proposal and resolution of acceptance are considered alone. The parties by their differences relating to substantive provisions in the lease as drawn evidenced the understanding that the proposal and acceptance were merely negotiating memoranda of their intent to enter into a lease all of whose terms were not as yet agreed upon. See also, Looman Realty Corp. v. Broad St. Nat.. Bk. of Trenton, 74 N.J. Super. 71 (App. Div. 1962).
Such facts are quite different from the nature of the May 11 memorandum in this case. In the first place, both parties signed the same document so that there can be no question of the meeting of their minds on the provisions in that document. Secondly, there are no indicia in terms of language which can serve as clues of any other intent than to be bound by its terms.
If, therefore, the document itself and the underlying facts relating to the negotiations leading to its execution evince such an intent, as found by the trial judge, does the *376 document contain sufficient essential provisions of a lease agreement to be enforceable as a completed contract?
The May 11 document sets forth in substantial detail the essential elements of a commercial lease as applicable to the particular premises and the intended use by the tenant. It incorporates the names of the parties, the length of the term, and the annual rent. It provides for the tenant to pay increases in taxes over the base year of 1971. It includes a warranty by the landlord that the air conditioning and heating equipment are in good working order. Provision is made for a security deposit of $10,000, with specific designation of the manner of application of the same to future rentals. Provisions are included which permit the tenant to expand the existing building, with particular undertakings as to additional rent, size of the physical extension, type of construction, etc. There is even included a paragraph authorizing the tenant to build a ramp to facilitate loading operations. And finally, a clause is included to permit the tenant to enter possession on May 18 with a rent abatement from that date to July 15. Paragraph 8 of the instrument also makes it clear that the tenancy is to commence on July 15, 1972, despite the permitted use prior to that date.
With such a detailed and thought-out instrument, which incorporates many special provisions applicable to the particular wishes of the parties beyond the usual format of a commercial lease, little else would be left for insertion in a formal lease except for the normal legal jargon typical of traditional drafting of leases.
Appellant asserts that there are no provisions relating to maintenance, insurance, repairs, assignment, etc. It is apparent that such provisions were not made. However it is not necessary for a writing to contain every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement. Seee 1 Corbin, Contracts, § 95 (1963); United States v. City of New York, 131 F.2d 909 (2 Cir.1942), cert. den., 318 U.S. 781, 63 S.Ct. 838, *377 87 L.Ed. 1149 (1943). Some of these issues may be determined by the operation of law, or the parties may resolve such differences by subsequent agreement, or a contract may be silent in those respects. In any event, a contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect. So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound. Such is the just and fair result. See 1 Corbin, Contracts, § 95 at 400 (1963); Volk v. Atlantic Acceptance, 139 N.J. Eq. 171 (Ch. 1947); Lind v. Schenley, 278 F.2d 79, 86 (3 Cir.1960). A prime example of a bare contract which does not contain many of the ultimate refinements of the undertaking of the parties is an insurance binder. Such a binder is a mere outline of the obligations undertaken by an insurance company. Yet it is universally held to constitute a binding contract for the limited period involved, on terms which are normally included in the ultimate policy issued by the insurance company. 1 Corbin, Contracts, § 30 (1963); Guest v. Kennesaw Life & Acc. Ins. Co., 97 Ga. App. 840, 104 S.E.2d 633 (App. Ct. 1940); Cottingham v. National Mut. Church Ins. Co., 290 Ill. 26, 124 N.E. 822 (Sup. Ct. (1919). This illustration is cited not as an exact parallel to the facts herein, but rather to demonstrate that the absence of some provisions in a document does not necessarily negate its viability as a binding agreement.
The key factor is not the absence of any contractual undertakings which may normally be included by contracting parties engaged in a similar transaction. It is rather the intent of the particular parties involved in the transaction at issue. And the presence or absence of essential contract provisions is but an element in the evidential panorama underlying a factual finding of intent and enforceability. In this case the contents of the May 11 document persuasively support the trial judge's conclusion of the intent of the parties to be bound thereby  a conclusion which is particularly *378 apt in view of the extensive busineses expertise of both parties.
In view of the foregoing it follows that the lessor and lessees entered into an enforceable contract. On that premise the breach by the lessees, motivated without valid reason, was wrongful in nature, subjecting them to liability not only to the lessor but also to the broker whose loss of commissions was directly caused by the defendants' wrongful conduct. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 559 (1967); Tanner Associates, Inc. v. Ciraldo, 33 N.J. 51, 67 (1960).
The judgment of the Law Division is accordingly affirmed.