738 A.2d 962

CENTRAL PAPER DISTRIBUTION SERVICES AND BERKOWITZ COMPANY, L.P., PLAINTIFFS–APPELLANTS, v. INTERNATIONAL RECORDS STORAGE AND RETRIEVAL SERVICE, INC., SANFORD B. WINNERMAN, LAWRENCE J. WINNERMAN, JONATHAN WINNERMAN, AND 110 EDISON PLACE, L.L.C., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 25, 1999—Decided September 28, 1999.

Before Judges KESTIN, WEFING and CARCHMAN.

*Christopher E. Hartmann* argued the cause for appellants (*Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen,* attorneys; *Mr. Hartmann* and *Carolyn M. Stockdale,* on the brief).

*Michael M. Rosenbaum* argued the cause for respondents International Records Storage and Retrieval Service, Inc. and 110 Edison Place, L.L.C. (*Budd Larner Gross Rosenbaum Greenberg & Sade,* attorneys; *Mr. Rosenbaum* and *Brian J. Slattery,* on the joint brief).

*Stewart M. Hutt* argued the cause for respondents Sanford B. Winnerman, Lawrence J. Winnerman and Jonathan Winnerman (*Hutt & Shimanowitz,* attorneys; *Mr. Hutt,* on the joint brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Plaintiffs appeal from the trial court's order granting defendants' motions for summary judgment and dismissing the matter, and from the trial court's denial of plaintiffs' cross-motions to modify a prior order and compel certain discovery. The trial court's order made no mention of the disposition of defendants' counterclaims. In the absence of any indication to the contrary by any of the parties, we take the trial court's order to have been final, *i.e.*, that the counterclaims were also dismissed. *See* Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 2:2–3 at p. 468 (1999 ed.) ("It is ... well settled that in order for a final judgment to be appealable, it must be final both as to all issues and all parties. If it is not final, respondent ... has the responsibility to move for its dismissal[.]"). After reviewing the record in the light of the written and oral arguments of the parties, we affirm in part and reverse in part.

Because the matter arose on defendants' motion for summary judgment, we view the facts in the light most favorable to plaintiffs, as the trial court was required to do. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

Plaintiffs owned and operated a commercial building in Newark. In 1993, they leased the fourth and sixth floors to defendant International Records Storage and Retrieval Service, Inc. (International) for ten years. Paragraph 31 of the lease established International's right to purchase the building if plaintiffs received an offer from another to purchase; and it set forth the mechanics governing the exercise of that right.

Plaintiffs received a letter dated November 10, 1995 from the attorneys for KJS, Inc. (KJS), a company also in the records storage business, which contained an offer to purchase the building on terms including the following:

1. Payment ... of $200,000 upon the satisfaction of all conditions precedent.

2. Lease ... to KJS of the entire Premises for a term of ten (10) years for an annual rent of $472,800[.]  * * * [Landlord] will assign all existing leases to KJS. The lease to KJS shall be subject to all existing leases.

3. At the end of the Lease Term ... KJS will have an option to purchase the Premises for $3,550,000 payable as follows....

In a letter of the same date, plaintiffs' attorney, Paul Petigrow, transmitted the offer to International:

As you are aware this office represents Berkowitz Company, L.P. and Central Paper Distribution Services, Inc. In accordance with the terms of the ... lease, notice is hereby given of the Landlord's intention to accept the Initial Offer attached hereto on the terms and conditions set forth therein.

This letter shall constitute the Initial Offer Notice, as said term is described in the ... lease.

Penny Novak, International's chief operating officer, responded that the offer was not complete to International's satisfaction. On November 17, Petigrow transmitted to International and its attorney "a new Initial Offer Notice on behalf of my client, with a revised Initial Offer attached[.]" The reference was to a November 16 letter from KJS which reiterated the terms of its November 10 letter, with an additional provision concerning plaintiffs'

right to occupy the property for two years after KJS leased it. Petigrow's transmittal letter stated:

> For the record, we feel that the Initial Offer which was included with the Initial Offer Notice of November 10, 1995 satisfied the requirements of the International Lease. The fact that the offer was (and the revised Initial Offer is still) subject to a physical and financial inspection of the Property, as well as execution of a mutually acceptable contract and lease agreement does not make the offer any less bona fide, nor does it make it not satisfy the requirements of an Initial Offer under the International Lease.

> Paragraph 31 of the International Lease does not require that my client negotiate a complete transaction, including all of the necessary documents, and spend substantial legal fees in connection with such transaction, before submitting the offer to you; nor does it require that the prospective purchaser expend legal and expert fees to review the books and records and physical condition of the Premises, as well as complete all of the legal documents, before knowing whether you will exercise your rights under the lease and preempt his proposed deal.

> Paragraph 31 of the International Lease only requires that we submit to you a bona fide written offer, which is what we have done. You can tell from the terms set forth in the Initial Offer whether you are in a position to and/or desire to give us a Preemptive Offer Notice. Are you willing to meet the price and pay on the terms set forth in the Initial Offer and can you provide my client with the security and guarantees which are contained in the Initial Offer?

In a letter dated November 22, International's attorney replied:

> In response to your letter of November 17th and the offer of November 16th, this is to advise you that my client, 110 Edison Place, L.L.C., hereby agrees to purchase on the terms set forth in the offer. I request that we have a meeting to discuss paragraph 2, 4, and the next to the last paragraph of the offer letter. Please call me so that we can arrange a meeting.

After KJS's attorney received a copy of the November 22 letter, he wrote to Petigrow on November 28:

> I am in receipt of a letter dated November 22, 1995 from Paul F. Rosenberg to you concerning his client['s] ... agreement to match the purchase terms previously set forth in my letter. . . .

> \* \* \*

> Also, on behalf of my client, I would like to advise you that we now consider this matter closed since Mr. Winnerman has advised that he will match my client's offer pursuant to his right of first refusal.

A meeting occurred on December 14, 1995, attended by principals and officers of the party business entities and their respective attorneys. Petigrow certified that he walked into the meeting

believing that International was going to buy the property, but "before anything else was even discussed at the meeting, [Rosenberg] announced that [International] was *not* going to buy the building."

During the first quarter of 1996, principals of the parties met again. A certification from one of those associated with plaintiffs was before the motion judge:

8. [Defendant] Sanford Winnerman said that the reason IRS originally exercised its right of first refusal was to prevent its competitor, KJS, Inc., from becoming IRS'[s] landlord. IRS did not want a competitor to use its position as landlord to gain information about IRS'[s] business or to interfere with IRS'[s] business, by, for instance, interfering with elevator service or other building services which would negatively impact IRS'[s] ability to run its business. Sanford Winnerman stated that he could not afford to let the sale to KJS, Inc. go through, and that he had to stop it. He had directed IRS'[s] actions.

9. Sanford Winnerman admitted in front of myself, Penny J. Novak and Robert Berkowitz that IRS was obliged to kill the deal with KJS by first exercising IRS'[s] right of first refusal, to prevent KJS, Inc. from becoming IRS'[s] landlord. After that, IRS would not complete its purchase. He admitted to me and others present that, from the outset, IRS never intended to purchase the property.

These assertions were supported by another of plaintiffs' principals, Robert Berkowitz, in his deposition. The record contains no sworn statement or other evidence disputing them.

Plaintiffs then approached KJS in an effort to sell the property on the terms KJS had offered previously. KJS stated it would purchase the property, but at a price and terms greatly reduced from those in the original offer. Plaintiffs rejected this modified offer. The property was eventually sold to a company which had acquired International. The sales price of the property, plaintiffs contend, was substantially lower than KJS's original offer.

Plaintiffs sued defendants, claiming eventually—after the complaint was twice amended: breach of contract, tortious interference with prospective economic advantage and with contractual relations, fraud, promissory and equitable estoppel, and "piercing the corporate veil." The trial court's dismissal of plaintiffs' claims on summary judgment was based on its determinations that no contract existed between plaintiffs and defendants, or between plaintiffs and KJS, and its evaluation that defendants would be

prejudiced by the addition of claims subsequent to Berkowitz's death and his final, *de bene esse*, deposition.

On appeal, plaintiffs challenge the dismissal of the breach of contract claim and the tortious interference claims. They also appeal from the trial court's dismissal on fairness grounds of the second amended complaint to the extent it asserted new causes of action divined after Berkowitz's *de bene esse* deposition and death, including a fraud claim. Other, related, issues are before us as well.

■ In deciding the breach of contract claim, the motion judge first determined that KJS's "alleged offer to purchase . . . was not an offer to purchase but an offer to lease, which included therein an option to purchase the premises." He went on:

> The determination . . . as to whether there was an agreement between [plaintiffs and defendants] would depend upon the interpretation of the documentary evidence and[,] to the extent there [were] ambiguities[,] by a consideration of the intentions of the parties.
>
> Mr. Berkowitz, in his *de bene esse* deposition, clearly testified that his intention was to sell the property, and he did not intend merely to create an option to purchase. Similarly, the response of [defendants] to the alleged offer to purchase was conditioned upon negotiation of the terms of the agreement, and particularly paragraph 5 thereof which contained the option to purchase. Therefore it is my . . . opinion that the offer and acceptance was not sufficient to create an enforceable contract. The view, of course, is consistent with my opinion that the offer to purchase was not a bona fide offer to purchase pursuant to paragraph 31.

■ With the showings plaintiffs had made, this issue could not be determined on summary judgment. Manifestly, the question whether the dealings between the parties constituted an offer and acceptance sufficient to create a contract to purchase is an issue of law to be determined by the court. *See Ram Const. Co., Inc. v. American States Ins. Co.*, 749 *F*.2d 1049, 1053 (3d Cir.1984) ("When the question is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law.") (citing 3 *Corbin on Contracts* § 534 (1960)); *see also id.* § 532 at 3 ("[The] rules of law respecting the formation of a valid contract . . . . [are not] rules of interpretation."). Nevertheless, in the circumstances presented here, the issue of law could not validly be decided in the

absence of factual findings bearing upon the dealings between plaintiffs and defendants. What each of the parties' principals did or said and how their conduct and words were perceived and acted upon, and whether reasonably or not, were among the critical determinants in resolving the issue of law. The issue was not amenable to resolution on summary judgment because plaintiffs had made an adequate showing of genuine questions of material fact bearing upon the issue, *see R.* 4:46–2(c), and they were entitled to plenary proof opportunities on the fact questions involved. *Ibid.; see also Brill, supra,* 142 *N.J.* at 528–35, 666 *A.*2d 146.

Moreover, the motion judge's sense that the underlying transaction between plaintiffs and KJS did not amount to an offer to purchase may also be subject to a different view with the development of a factual record and application of the interplay among pertinent principles governing contractual formation. *See, e.g., Tung v. Briant Park Homes, Inc.,* 287 *N.J.Super.* 232, 239, 670 *A.*2d 1092 (App.Div.1996); *Berg Agency v. Sleepworld–Willingboro, Inc.,* 136 *N.J.Super.* 369, 373–74, 346 *A.*2d 419 (App.Div. 1975); *Paley v. Barton Sav. And Loan Ass'n,* 82 *N.J.Super.* 75, 83, 196 *A.*2d 682 (App.Div.), *certif. denied,* 41 *N.J.* 602, 198 *A.*2d 446 (1964).

Finally as to the breach of contract issue, we discern that, in dismissing the claim, the trial judge gave insufficient consideration to plaintiffs' allegations that defendants had also defaulted on their responsibilities under paragraph 31 of International's lease, at least to the extent of breaching the "implied covenant of good faith and fair dealing" which "every contract in New Jersey contains[.]" *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 420–25, 690 *A.*2d 575 (1997).

The trial court, however, was correct to dismiss the claim based upon tortious interference with contractual relations, and may have been correct also to dismiss the claim based upon tortious interference with prospective economic advantage. Plaintiffs made no showing that defendants had dealt with KJS at all in

an effort to dissuade that entity from dealing with plaintiffs or to persuade KJS to withdraw its offer. Some such efforts addressed to the third party's involvement or its interests are, to varying degrees, essential elements of both causes of action. *See Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 *N.J.* 739, 752–53, 563 *A.*2d 31 (1989). If it were otherwise, every breach of contract claim which implicated a putative contractual relationship with a third party would also include a claim for some type of tortious interference irrespective of whether there were allegations that the defendant had done something beyond the breach itself to engender the separate cause of action. Here, there was no showing of any independent conduct which could be seen as intermeddling in the relationship between plaintiffs and their prospective purchaser, KJS. Where a plaintiff has a viable breach of contract claim which is based on proofs congruent with those available to establish tortious interference, there is no need to stretch the law to fit special circumstances in a redundant effort to accomplish substantial justice, especially in a jurisdiction such as ours where the implied covenant of good faith and fair dealing is so firmly implanted. *See id.* at 753, 563 *A.*2d 31.

█ We recognize, however, that there is at least one important distinction between these two tortious interference causes of action in that interference with prospective economic advantage may also be established by showing conduct not necessarily directed at the third party, but which improperly impinged upon the claimant's reasonably expected economic advantage from or with regard to that third party. The difference is classified in the *Restatement (Second) of Torts* § 776B (1979), which announces the availability of such causes of action

whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

The preference for adjudicating such issues by principles of contract law, as articulated in *Printing Mart, supra,* 116 *N.J.* at 752–53, 563 *A.*2d 31, cannot be ignored, however. We discern,

even from the attenuated record before us in this summary judgment appeal, that the interference with contractual relations claim has no viability independent of the breach of contract claims because everything defendants are alleged to have done by way of contractual interference corresponds directly with their contractual duties to plaintiffs. But the cause of action for interference with prospective economic advantage may have separate qualities if there are proofs that defendants acted in ways which would not constitute a breach of contract and served unreasonably to deprive plaintiffs of economic benefits they had a right to expect. The latter determination cannot be made on the record before us.

■ With the foregoing insights into some similarities and differences between these two tortious interference causes of action, we therefore leave it to the trial court to determine, in the first instance, whether plaintiffs' claim for tortious interference with prospective economic advantage is demonstrably different, either in the evidence offered in support of it, or in the factual or legal theories upon which the claim is based, from those advanced to support their breach of contract claims. If so, plaintiffs should be permitted to go forward in prosecuting that tortious interference claim. If not, they should be limited to the breach of contract claims in this regard as well.

We are mindful that questions of tort liability may bear differently on the business entity defendants and the individual defendants. *See Printing Mart, supra.* We do not address these issues because they have not been raised in this appeal.

The motion judge also dismissed plaintiffs' new allegations, including a claim of fraud, contained in the second amended complaint, because of his determination that defendants would be prejudiced by the addition of claims subsequent to Berkowitz's death in respect of which his knowledge was essential and which involved features inadequately explored on discovery while he was alive. The court observed that "[c]laims of fraud, equitable estoppel and promissory estoppel raise questions of issues such as

material misrepresentation of a fact knowing it to be false, [and] that the plaintiff relied upon such facts to their detriment."

We are in substantial agreement with the motion judge's discretionary determination in this regard. As a result of our ruling that plaintiffs' breach of contract claims are viable and should proceed to trial, whatever elements of proof relating to those causes of action which were developed through the conclusion of the Berkowitz *de bene esse* deposition may fairly be used in prosecuting those claims. The trial court was well justified in concluding, however, that defendants would be unfairly prejudiced by reason of Berkowitz's death from developing defenses as to new causes of action which came to light in his *de bene esse* deposition. Plaintiffs had ample opportunity in the sixteen months that had passed from the filing of the complaint—if not also in the additional preceding six months since the cause of action arose—to refine their approaches in ways that would have afforded defendants fair opportunity to meet them.

In the light of this disposition reinstating the breach of contract claims and, possibly, the claim for tortious interference with prospective economic advantage, the trial court should reconsider its denial of plaintiffs' motion to compel certain discovery. It will also be appropriate for the trial court to entertain an application from defendants seeking restoration of counterclaims. As we have noted above, in the absence of a motion to dismiss the appeal for want of finality, we have considered the trial court's order dismissing the matter to encompass the counterclaims as well. There was no cross-appeal in that regard. Thus, the procedural posture of the matter at this juncture is that the counterclaims remain dismissed. Now that we have restored plaintiff's breach of contract claims and have allowed for the possibility that the cause of action for tortious interference with prospective economic advantage might be seen as separately viable, considerations of fairness require that defendants be afforded an opportunity to revive those of their counterclaims as have likely merit. They may move for such relief before the trial court, which should

evaluate each counterclaim individually and restore those which would have survived a motion for summary judgment.

Affirmed in part;  reversed in part;  remanded.