838 A.2d 556

SYLVESTER WILLIAMS PLAINTIFF, v. JOSEPH VITO, JOHN DOE DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided August 11, 2003.

*William D. Sanders*, West Orange, for plaintiff (*Alpert Butler Sanders Norton & Bearg*, P.C.).

*John M. Lago,* for defendant (*Chasan, Leyner, Bariso & Lamparello*).

## JAMES S. ROTHSCHILD, JR., JSC.

This case presents the issue of whether a settlement agreement between counsel in a personal injury action—-communicated to the court but not memorialized in writing—-may be enforced.

The issue arises on a motion by defendant Joseph Vito ("Vito") to enforce a $10,000 settlement in this matter. After learning of Vito's intention to make this motion, the court scheduled a hearing which was held on June 16. The purpose of this letter is to set out the conclusions the court reached after the hearing. With one exception, the facts in this matter are undisputed; the court will begin with the undisputed facts.

In 1990 Sylvester Williams ("Williams") brought a lawsuit against Vito for damages emanating from an automobile accident. Williams had retained the firm of Roche & Carter to handle the case. Vito's carrier, All State, was represented by John Lago ("Lago") of the Chasan, Leyner, Bariso & Lamparello firm. The case was arbitrated for $31,500.00, but defendant was unsatisfied with that amount and decided to proceed *de novo.*

The case was scheduled to be tried on Monday, April 22, 2002. Williams was aware of this date because he had received a letter from Roche & Carter telling him about it. By April, 2002 Williams' relationship with Roche & Carter was somewhat strained because Roche & Carter had changed the attorneys assigned to his case several times, and allegedly only communicated with Williams by mail on a "need to know" basis. On Friday, April 19, 2002 the Roche & Carter attorney handling this matter was Harris Gould ("Gould").

Gould spoke to Williams sometime after 2:00 on the 19th and said that All State was offering $10,000. It is undisputed that Williams said no and instructed Gould to try for $20,000. Williams testified that he insisted on $20,000 because that would have been

his net recovery on the $31,500 figure. It is further undisputed that Gould called Lago and asked for $20,000, but that Lago said that he could not go above $10,000.[1]

The only area of dispute concerns the next telephone conversation which was between Gould and Williams, Williams testified that he emphatically rejected the $10,000, saying "Where's my $20,000". Gould claims that Williams said, "I am tired of this and I will take the $10,000". The court will discuss its views as to this conversation subsequently.

What happened after the Williams—Gould conversation is undisputed. Gould called Lago and accepted the $10,000. He called the office of the Civil Assignment Judge later that afternoon and stated that the case was settled. The records of the Civil Assignment Judge's office state "Rec'd. Phone Call from Atty... Settled". On Monday, April 22, Civil Assignment Judge Eugene J.Codey signed an "Order of Disposition" ordering the case marked "Settled". Neither counsel forwarded settlement papers to each other. Gould's failure to forward settlement papers may have been due to the fact that he left Roche & Carter soon thereafter. Lago attributes the delay to "transition" in the Roche & Carter office.

At 9:30 a.m., on Saturday, April 20, 2002, one day after the Civil Assignment Judge and Lago were told the case was settled, Williams called Roche & Carter and left a message with the receptionist, saying "Had time to think it over, wants to go to court now!" Gould did not get that message until Monday, April 22, 2002. On April 22, 2002, Williams again called Roche &

---

[1] It appears that Williams and Gould may have misunderstood each other on the meaning of the $20,000 figure. Williams apparently perceived it as a net figure, giving him what the arbitrator would have given him. Gould apparently understood it as a gross figure because he asked Lago for $20,000, not $30,000. Since Gould and Lago later reached agreement on $10,000, the misunderstanding is not relevant if one concludes that Williams gave Gould authority to accept $10,000. As set out in the last paragraph of this opinion, to be totally fair to Williams, the court will assume the $10,000 figure was net to Williams.

Carter, this time speaking to both Gould and either a paralegal or a secretary. In both conversations Williams said he did not want to accept the settlement and wanted to go to court. Gould told Williams that "It's too late now". Neither on Monday, April 22, 2002 nor any day after that, did Roche & Carter inform the Civil Assignment Judge or Lago that Williams opposed the settlement.

Gould left Roche & Carter on or around April 29, 2002 for reasons unrelated to the *Williams v. Vito* case. He informed Mitchell Friedman, a Roche and Carter associate, of the settlement dispute, but did nothing further concerning the matter.

In December 2002, Williams gave testimony in an unrelated case. Defense counsel in that case asked Williams on cross-examination if he had settled *Williams v. Vito*, and when Williams said no, counsel showed him the "Order of Disposition". Williams immediately replied that he had never settled *Williams v. Vito*. (That second case settled during trial. There does not appear to be any allegation that the settlement was forced by the cross-examination in question).

Immediately afterward, in December 2002, Williams personally visited Roche & Carter to complain about what had occurred. Upon receiving no satisfaction, he asked the law firm that had handled his second lawsuit to investigate this matter. That firm re-activated *Williams v. Vito*, leading to this motion.

As set out above, the only fact in issue is what happened in the April 19, 2002 Williams–Gould conversation. This court believes that, although Williams was a compelling and credible witness, he most likely very reluctantly told Gould. "I am tired of this and I will take the $10,000." The reasons the court believes this are as follows:

(a) It is difficult to imagine why Gould, who was also a compelling and credible witness, would have called Lago and the office of the Assignment Judge to report a settlement unless he had been told by Williams that Williams would take $10,000.

(b) Williams' telephone call on Saturday April 20, 2002—"Had time to think it over, wants to go to court now!"—bespeaks the concerns of a man who had changed his mind.

(c) Williams' telephone calls on Monday April 22, 2002 also bespeak the concerns of a man who had changed his mind.

This does not mean that the court concludes Williams is dishonest, or that Williams thought *Williams v. Vito* was settled. The court is certain that Williams believed that the case would go to trial at some point. The court does conclude, however, that on April 19, 2002 Williams reluctantly said he would take $10,000.

The Appellate Division set out the public policy reasons favoring settlements in *Dept. of Public Advocate v. N.J. Bd. of Pb. Ut.*, 206 *N.J.Super.* 523, 528, 503 *A.2d* 331 (App.Div.1985) where Judge (now Justice) Long stated:

In our view the beginning point of this analysis is the strong public policy in this state in favor of settlement. The point of this policy is not the salutary effect of settlements on our overtaxed judicial and administrative calendars (although this is an undeniable benefit) but the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone. In recognition of this principle, courts will strain to give effect to the terms of a settlement wherever possible.

In *Pascarella v. Bruck*, 190 *N.J.Super.* 118, 462 *A.2d* 186 (App.Div.1983) *cert. den.*, 94 *N.J.* 600, 468 *A.2d* 233 (1983), the plaintiff contacted her attorney after an oral $25,000 settlement agreement was made and told the attorney that she refused to go through with the settlement. The trial court held the settlement unenforceable. The Appellate Division stated that there is no legal requirement that there be court approval in such a case. "[T]he practice of spreading the terms of the agreement upon the record, although a familiar practice, is not procedure requisite to enforcement. That the agreement to settlement was orally made is of no consequence, and the failure to do more than, as here, inform the court of settlement and have the clerk mark the case settled has no effect on the validity of compromised disposition." *Id.* at 124, 462 *A.2d* 186. The Appellate Division reasoned as follows:

We adopt these principles as consistent with the announced public policy of the jurisdiction favoring settlement of litigation. Settlements of this nature are entered into daily in our courthouse corridors and conference rooms, the court only aware, until informed of the fact of settlement, that counsel and the parties are working toward that desirable end. Adoption of a principle that such agreements

are subject to attack because they were not placed upon the record places in unnecessary jeopardy the very concept of settlement and the process by which settlement of litigation is ordinarily achieved. *Id.*

The Appellate Division in *Pascarella* went on to state that:

An agreement to settle a lawsuit is a contract which, like all contracts, may be freely entered into and which a court, absent a demonstration of "fraud or other compelling circumstances," should honor and enforce as it does other contracts. *Id.* at 124–25, 462 A.2d 186.

In *Pascarella* the Appellate Division found no fraud, or other circumstances sufficiently compelling to rescind an agreement. It noted that one compelling circumstance could have been grossly shocking inadequacy of consideration. In that case it found on the facts that the $25,000 settlement was not clearly inadequate.

■ In this case the court realizes that the $10,000 settlement was less than one-third of the arbitrated figure. Also, Gould felt that the $10,000 figure was "light", in that there was a relatively heavy impact accident in which Williams may have suffered two herniated disks, and a possible foot fracture. Further, liability favored Williams. (The converse of this case, *Williams v. Vito*, settled for a small sum because liability favored Williams.)

On the other hand, there are reasons that the $10,000 figure was not inadequate. First, both herniations were quite shallow with no proof of nerve root impringement. Second, there was evidence of degenerative disc disease. Third, Williams Williams' alleged foot fracture was not clear cut. Fourth, Williams' claim that he often "fell down" is not supported by the medical records. For these reasons Lago argued, and Gould feared, that Williams might not be able to surmount the verbal threshold.

In addition, Vito had policy limits of $25,000, making that figure the realistic upper limit of a good result. It should also be noted that Gould is, and was in 2002, an experienced trial lawyer, who had no reason to panic or fear the *Williams v. Vito* trial. He had a witness availability problem, but was certain that the Assignment Judge would have granted an adjournment since Lago would have consented. He would presumably have advised Williams to reject the $10,000 offer if he felt it were clearly inadequate, that

he did not do so tends to confirm that the figure is not clearly inadequate.

This court might view the case as being slightly more valuable than $10,000 but does not believe $10,000 is grossly inadequate, let alone so grossly inadequate as to trigger judicial invalidation.

The *Pascarella* holding was followed several years later in *Bistricer v. Bistricer,* 231 *N.J.Super.* 143, 555 *A.*2d 45 (Ch.Div. 1987). In *Bistricer* counsel had informed Judge Humphreys in a telephone conference that a case was settled "subject to counsel's submitting an order." *Id.* at 146–47, 555 *A.*2d 45. When counsel for defendants forwarded a stipulation of settlement to plaintiffs' counsel, plaintiffs' counsel objected to various terms. Judge Humphreys held that the six terms plaintiffs objected to were afterthoughts which should not abrogate their telephone agreement. He noted that, "Moreover, the proposition that a case is not settled until the last 'i' is dotted and the last 't' is crossed on a written settlement agreement carries the germ of much mischief." *Id.* at 152, 555 *A.*2d 45.

 The proposition on which *Pascarella* and *Bistricer* are based—that, absent a statute to the contrary, an oral offer and acceptance constitutes a binding agreement—is central to American contract law. See, *Restatement, Second, Contracts,* § 19(1) (*"Restatement"*) "The manifestation of assent may be made wholly or partly by ... spoken words..." The existence of an enforceable contract is not negated by the fact that subsequent writings are contemplated. See, *Restatement,* § 27 "Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adapt a written memorial ..." [2] New Jersey follows this rule. See, *Comerata v. Chau-*

---

[2] The commentators are in agreement, *See, e.g., Williston on Contracts,* Agreements Preliminary to Intended Written Contracts: § 4:8 (1990)("...where it was understood that the contract should be formally drawn up, and put into writing, the transaction is nevertheless complete and binding absent a possible agree-

*mont, Inc.,* 52 *N.J.Super.* 299, 145 *A.2d* 471 (App.Div.1958) (oral agreement and one sentence memorandum constitutes enforceable lease). And see, *Berg Agency v. Sleepworld–Willingboro, Inc.,* 136 *N.J.Super.* 369, 346 *A.2d* 419 (App.Div.1975) (letter agreement enforceable even though one party rescinded prior to signing lease). In the context of settlement negotiations, see *U.S. v. Lightman,* 988 *F.Supp.* 448, 459 (D.N.J.1997) where Judge Simandle enforced a complicated multi-million dollar settlement agreement in a Superfund case, holding that "the fact the written document was never executed is irrelevant to the enforceability of the agreement...".[3]

Comment C to § 27 of the *Restatement* discusses the circumstances which are helpful in determining whether a contract has been concluded; among these are several which indicate that a writing is not required herein: "whether it has few or many details," "whether the amount involved in large or small," and "whether a standard form of contract is widely used in similar transactions." A straight forward automobile accident settlement would seem to fall within the category of situations in which an oral contract is meant to be enforceable prior to the execution of a writing. Indeed, a two car automobile case is more amenable to an oral agreement than the $7,000,000 multi-term agreement held enforceable in *Lightman* or the agreement held enforceable in *Bistricer.*

According to the *Restatement,* even if Gould had communicated Williams' dissatisfaction to Lago on April 22, Vito and All–State would have been justified in contending that the agreement was enforceable. See, Restatement, § 42, Comment C, "Once the

---

ment that it should not be binding until so reduced to writing and formally executed.") *See also, Corbin on Contracts,* "Offer and Acceptance: § 2.9 (1993)("If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract.")

[3] The parties had exchanged numerous drafts, as would be expected in the settlement of a large Superfund case.

offeree has exercised his power to create a contract by accepting the offer, a purported revocation is ineffective as such." The decision in this case is only made easier by the fact that no revocation was attempted for almost a year.

■ Although not directly on point because the oral settlement agreement at issue was memorialized in letters, *Hagrish v. Olson*, 254 *N.J.Super.* 133, 137–38, 603 *A.2d* 108 (App.Div.1992) is instructive. The trial court in *Hagrish* had denied a motion to enforce a $7,000 settlement because the attorneys had become embroiled in a dispute over releases, causing the court to conclude there was never a binding agreement. The Appellate Division reversed:

Absent unusual circumstances, the courts should enforce executory agreements to settle litigation. *Jannarone v. W.T. Co.*, 65 *N.J.Super.* 472, 476–477, 168 *A.2d* 72 (App.Div.1961). Plaintiffs' failure to execute release documents did not void the original agreement, nor did it render it deficient from the outset. Execution of a release was a mere formality, not essential to formation of the contract of settlement. "So long as the basic essentials are sufficiently definite, any gap left by the parties should not frustrate their intention to be bound." *Berg Agency v. Sleepworld–Willingboro, Inc.* 136 *N.J.Super.* 369, 377, 346 *A.2d* 419 (App.Div.1975).

■ All cases of the kind must be resolved by ascertaining the intent of the parties. *Restatement*, § 19(1). There is no doubt that Gould and Lago intended to settle when they agreed on the $10,000 figure. The court also believes that if Williams did tell Gould he would accept $10,000, he intended this to end the case. Put differently, the court concludes that none of the participants in this case thought that agreeing to an amount was an intermediate step which had no legal efficacy until settlement papers were executed.

This court is aware that neither Vito nor All State would be prejudiced by a decision that the settlement is unenforceable. But in *Pascarella, Bistricer* and *Hagrish* the party seeking to enforce the settlement would have suffered no actual prejudice if the settlement were deemed unenforceable. Rather, the prejudice or harm caused by such a decision would be systemic: New Jersey attorneys and judges could not rely on a telephonic communication that a settlement was consummated. As both the Appellate

Division in *Pascarella* and Judge Humphreys in *Bistricer* noted, such harm would not be trivial.

The Ninth Circuit Court of Appeals in *Lockette v. Greyhound Lines*, 817 *F*.2d 1182 (5th Cir.1987), applying Louisiana law, held that the absence of prejudice was a factor to be considered in deciding whether to allow a party to rescind an apparent settlement acceptance. That case is not in point, however, since the plaintiff had told her attorney that she would have to "talk to somebody [another attorney] about the settlement, but her attorney did not communicate that reservation either to Greyhound's attorney or to the District Court when he said the case was settled." *Id.* at 1184. Later that same day, the plaintiff told her attorney that her consultation led her to reject the proposal, and the attorney reported same to the District Court. In those circumstances, it was appropriate for the Court of Appeals to hold that plaintiff was not estopped from denying the settlement. *Lockette* is similar to *Carter v. City of Philadelphia*, 1989 *WL* 121919 at *4 (E.D.Pa.1989) where the attorney had settled a case "subject to" plaintiff's consent; after the client rejected the settlement, the District Court denied a motion to enforce, noting that "Defendants in this case have not argued or presented any evidence that their case would be seriously prejudiced if the proposed settlement is not enforced." Neither *Lockette* nor *Carter* stand for the proposition that the absence of prejudice is relevant outside of the situation where the plaintiff reserved the right to reject a settlement.

This court is therefore constrained to find the settlement enforceable, which leaves it with one final question. The court has concluded that Williams told Gould he would take $10,000 and that Gould communicated that acceptance to Lago. Yet, as noted in footnote 1 above, the record is unclear as to whether Williams meant $10,000 net to himself or $10,000 gross. The most logical conclusion is that he meant $10,000 net to himself, because his previous insistence on $20,000 was $20,000 net to himself, to equal the $31,000 arbitration award, which would have given him

$20,000. In sum, Williams was thinking, as would many non lawyers, in net terms. Gould, like many lawyers, was thinking that $10,000 meant $10,000 total. If either Williams or his attorney must suffer from the apparent miscommunication between themselves, the fairest solution would be for the attorney to bear the burden. Thus, the entire $10,000 must be paid by All State to Williams, with no monies to be paid to Roche & Carter. Interest will run from April 22, 2002.[4] The parties are instructed to execute the necessary settlement documents.

---

[4] The *Hagrish* court provides for interest "at a rate to be fixed pursuant to *R.* 4:42–11(a)(ii)", 254 *N.J.Super.* at 139, 603 *A.2d* 108.